# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

———————————

**No. 201500247**

———————————

## UNITED STATES OF AMERICA
Appellee

v.

## NATHANIEL RODRIGUEZ
Aviation Electronics Technician First Class (E-6), U.S. Navy
Appellant

———————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Commander Marcus N. Fulton, JAGC, USN.
Convening Authority: Commander, Navy Region Northwest,
Silverdale, WA.
Staff Judge Advocate: Commander Edward K. Westbrook,
JAGC, USN.
For Appellant: Captain Daniel R. Douglass, USMC;
Lieutenant Doug Ottenwess, JAGC, USN.
For Appellee: Major Cory A. Carver, USMC; Lieutenant Jetti L.
Gibson, JAGC, USN.

———————————

Decided 30 January 2017

———————————

Before PALMER, MARKS, and CAMPBELL, *Appellate Military Judges*

———————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

———————————

PALMER, Chief Judge:

A panel of members with enlisted representation, sitting as a general court-martial, convicted the appellant, contrary to his pleas, of four specifications of assault consummated by battery and one specification of aggravated assault of a child with means or force likely to produce death or grievous bodily harm in violation of Article 128, Uniform Code of Military

Justice (UCMJ), 10 U.S.C. § 928 (2012).[1] The aggravated assault conviction was for a lesser included offense, as the members acquitted the appellant of intentional infliction of grievous bodily harm. The appellant was sentenced to two years' confinement and a bad-conduct discharge. The convening authority approved the sentence as adjudged and executed all but the discharge.

The appellant asserts 10 assignments of error (AOE)[2]: (1) the military judge erred by denying defense access to potentially favorable evidence in the complaining witness's psychotherapist-patient records; (2) the evidence is legally and factually insufficient to support a conviction for aggravated assault with means or force likely to produce death or grievous bodily harm; (3) the military judge committed prejudicial error by instructing the members that "'the risk of death or grievous bodily harm must be more than merely a fanciful, speculative or remote possibility;'" (4) the military judge's failure to grant a mistrial after the government gave the members inadmissible matters too prejudicial for a curative instruction necessitates setting aside the findings and sentence; (5) the military judge committed prejudicial error by denying the motion to sever charges against the appellant; (6) the report of results of trial misstates the appellant's conviction for aggravated assault; (7) two years' confinement is an inappropriately severe sentence and was likely influenced by the evidence of the appellant's steroid use erroneously presented to the members; (8) the appellant's inadequate medical care during post-trial confinement violated his Eighth Amendment and Article 55, UCMJ, rights; (9) the assault consummated by battery convictions represent an unreasonable multiplication of charges; and (10) the military judge committed plain error by instructing the members that "if based on your consideration of the evidence, you are firmly convinced that the accused is guilty of the crime charged, you must find him guilty."

Additionally, we specified the issue of whether Specifications 1 and 2 of Charge II are multiplicious. In response, the appellant argues that they are and that Specification 2 should have been dismissed before findings.

We find merit only in the third AOE—that the military judge erred in the findings instructions regarding aggravated assault of a child with a means or force likely to produce death or grievous bodily harm. In our decretal paragraph, we set aside that conviction and the sentence, thereby rendering

---

[1] The appellant was acquitted of another aggravated assault with means or force likely to produce death or grievous bodily harm, and the military judge granted a RULE FOR COURTS-MARTIAL (R.C.M.) 917, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.) motion for a finding of not guilty for a single specification of maiming in violation of Article 124, UCMJ.

[2] The fifth, sixth, seventh, eighth and ninth AOEs are raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

the sixth and seventh AOEs moot. We conclude the remaining findings are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant remains. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

The appellant's convictions involve assaults of his ex-girlfriend, former Petty Officer First Class BLS, and their six-week-old daughter, AMR.

During 2012, the appellant, on divers occasions, kicked, punched, slapped, and choked BLS at their Oak Harbor, Washington home. That June, while vacationing in South Padre Island, Texas, the appellant pushed BLS, causing her to fall and fracture her elbow. The assaults stopped when the appellant deployed that fall and for the duration of BLS' pregnancy, which began shortly after the appellant's return. But on 18 September 2013—the night before AMR was born—the appellant broke down a locked bathroom door and attacked BLS, punching and kicking her, including in her stomach.

On 2 November 2013, BLS awoke early to drive visiting family members to the airport. The appellant remained home alone with AMR and BLS's four-year-old son from her prior marriage. Between 1430 and 1500 that afternoon, BLS returned from the airport. Upon entering the home, the appellant alerted her that AMR was in distress. After the appellant called an urgent care center, he and BLS drove AMR to an emergency room.

The emergency room doctor observed AMR breathing slowly and having seizures. The doctors discovered an acute subdural hemorrhage, or recent bleeding between AMR's brain and skull. Based on this finding, the doctor arranged to fly AMR to a trauma center.

The next night, 3 November, civilian law enforcement conducted a non-custodial interview of the appellant at the trauma center. During the interview, the appellant described the events of 2 November in detail. Between 1300 and 1330 that afternoon, he fed AMR, burped her, and prepared to change her diaper. While AMR laid face-up on the couch, she vomited what appeared to be most of the bottle of formula. The appellant said he rolled her on her side and burped her, but she began gurgling. Her breaths were short, and she was not crying normally. The appellant said he picked her up, carried her to the sink, turned her face down, held her in his left hand, and patted her back with his right hand. He stated formula and mucus leaked from her nose and mouth, but her breathing remained short. When the appellant turned AMR face up, her lips were blue. He said he was "tapping on her back . . . trying to just . . . shaking her chest to see if you know more stuff would come out and it didn't and she was just turning bluer and bluer. So at this point she started seizing up."[3] Her body became "stiff as

---

[3] Prosecution Exhibit (PE) 4 at transcript page 559.

a board."[4] The appellant said he laid her on the couch, elevated her neck, and attempted to give her cardiopulmonary resuscitation with two fingers on her chest. She started breathing again, but not normally. Her body was alternately stiff and limp. While her body was relaxed, the appellant changed her diaper and replaced her sleeper. He did not call 911 or otherwise seek assistance until after BLS came home.

Testimony from the treating physicians and AMR's treatment records comprise the remaining evidence about what happened to the infant. Although AMR presented at the emergency room without any significant external trauma, her seizures continued for another day or so. Ultimately, all organic causes for AMR's injuries were eliminated. Because the appellant and BLS denied that AMR had suffered a fall or other accident, the doctors rendered a medical diagnosis of non-accidental trauma. As a result of AMR's injuries, she and her half-brother were placed in protective custody.

During an argument on 15 November 2013, while AMR remained in the hospital and in protective custody, the appellant sent BLS a series of incriminating text messages. Begging BLS not to leave him, the appellant offered a written confession that he had struck BLS, including while she was pregnant:

> Appellant: And for what its [sic] worth, ive [sic] never tried to blame me hitting you on you. I said that you know what to do and say to provoke the absolute worst part of me to come out. Save this message if you want, im [sic] admitting to it.
>
> BLS: Admitting to what[?]
>
> Appellant: Hitting you. I admit to it entirely. . . . Hitting a pregnant woman is a felony that has no statute of limitations and ill [sic] admit to that too.[5]

BLS testified that in December 2013 an argument ensued after she questioned the appellant about his version of what happened to AMR on 2 November. According to BLS, the appellant then choked her nearly to unconsciousness.[6] Eventually, she reported the alleged choking incident and the appellant's pattern of physical abuse that occurred in 2012.

BLS left the appellant in February 2014 and regained custody of her children in April 2014, purportedly because of the separation. She provided

---

[4] *Id.* at 551.

[5] PE 1 at 1.

[6] The members acquitted the appellant of this assault allegation.

Naval Criminal Investigative Service agents a statement and gave them the appellant's incriminating text messages on 20 June 2014.

## II. DISCUSSION

### A. Factual and legal sufficiency

We review questions of legal and factual sufficiency *de novo. United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, any reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Day*, 66 M.J. 172, 173-74 (C.A.A.F. 2008) (citing *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987)). In applying this test, "we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is whether "after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt." *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006) (citing *Turner*, 25 M.J. at 325 and Art. 66(c), UCMJ), *aff'd on other grounds*, 64 M.J. 348 (C.A.A.F. 2007). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. While this is a high standard, the phrase "beyond a reasonable doubt" does not imply that the evidence must be free from conflict. *Rankin*, 63 M.J. at 557.

In order to convict the appellant of aggravated assault consummated by a battery upon a child under the age of 16, by a means or force likely to produce death or grievous bodily injury, in violation of Article 128, UCMJ, (Specification 5 of Charge II) the government had to prove:

> One, that on or about 2 November 2013, at or near Oak Harbor, Washington, the accused did bodily harm to AMR;
>
> Two, that the accused did so by moving her with his body;
>
> Three, that the bodily harm was done with unlawful force or violence;
>
> Four, that the force was used in a manner likely to produce death or grievous bodily harm; and

Five, that AMR was a child under the age of 16 years.[7]

As described, *supra*, on 2 November 2013 AMR presented to a medical facility suffering from an acute subdural hemorrhage, a permanent injury to her brain. At trial, multiple medical experts testified as to the cause of AMR's injuries and cited "trauma is probably the highest, the most likely cau-- reason, whether it be accidental or non-accidental[,]"[8] as no organic or non-trauma event would have caused AMR's seizures or subdural bleeding; that AMR was too young to roll over and thus unable to cause the injuries to herself; that the injuries most likely occurred on 2 November 2013; that it was unlikely the injury occurred before the morning of 2 November 2013 because AMR was "eating normally . . . and acting normally;"[9] and that subdural hemorrhaging can be caused by acceleration/deceleration forces such as shaking or whiplash. AMR's grandparents and her aunt and uncle testified they had done nothing to harm AMR, and AMR was fine before being left alone with the appellant. The appellant's own statements reveal AMR went into distress while under his exclusive care in the five to six hours before her respiratory arrest. Additionally, even though the appellant described his daughter as turning blue, having seizures, and not breathing— to the extent he needed to revive her with cardiopulmonary resuscitation—he inexplicably did not call 911 or seek medical attention for her until BLS came home.

Finding the members were properly instructed on the use of circumstantial evidence,[10] and recognizing that "[f]indings may be based on direct or circumstantial evidence[,]"[11] after weighing all the evidence in the record of trial, the pleadings, and having made allowances for not having personally observed the witnesses, we are convinced beyond a reasonable doubt of the appellant's guilt. With the exception of the instructional error discussed *infra,* we are similarly satisfied the appellant's court-martial was legally sufficient.

## B. Aggravated assault instruction

The appellant claims prejudicial error in the military judge's instruction that "the risk of death or grievous bodily harm must be more than merely a fanciful, speculative, or remote possibility." We agree.

---

[7] Record at 1097; MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), Part IV, ¶ 54b(4)(a).

[8] Record at 463.

[9] *Id.* at 528.

[10] *Id.* at 1106.

[11] R.C.M. 918(c).

Proper instructions to the members are a question of law we review *de novo*. When, as here, the appellant fails to object to an instruction at trial, we review for plain error. *United States v. Payne*, 73 M.J. 19, 22-23 (C.A.A.F. 2014). Plain error requires an appellant to demonstrate that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused. *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011) (holding that where an erroneous instruction implicated a constitutional issue and where the error was obvious, the appellant must also suffer prejudice to a substantial right).

*1. Error that was plain or obvious*

The subject instruction provisions, taken directly from the Military Judges' Benchbook,[12] defined "force likely to produce death or grievous bodily harm," an element of aggravated assault with a dangerous weapon or other means or force likely to produce death or grievous bodily harm:

> A force is likely to produce death or grievous bodily harm when the natural and probable results of its particular use would be death or grievous bodily harm. It is not necessary that death or grievous bodily harm actually result.
>
> . . . .
>
> The likelihood of death or grievous bodily harm is determined by measuring two factors. Those two factors are: one, the risk of harm; and two, the magnitude of the harm. In evaluating the risk of the harm, the risk of death or grievous bodily harm must be more than merely a fanciful, speculative or remote possibility. In evaluating the magnitude of the harm, the consequence of death or grievous bodily harm must be at least probable and not just possible, or in other words, death or grievous bodily harm would be a natural and probable consequence of the accused's act. Where the magnitude of the harm is great, you may find that an aggravated assault exists even though the risk of harm is statistically low. For example, if someone fires a rifle bullet into a crowd, and a bystander in the crowd is shot, then to constitute an aggravated assault, the risk of harm by hitting—of hitting that person need only be more than merely a fanciful, speculative or remote possibility

---

[12] Military Judges' Benchbook, Dept. of the Army Pamphlet, 27-9 at 735-36 (10 Sep 2014).

> since the magnitude of harm which the bullet is likely to inflict
> on that person it—it hits is great.[13]

The military judge's error in providing this instruction was plain or obvious. Weeks before this trial, the Court of Appeals for the Armed Forces (CAAF) expressly overruled *United States v. Joseph*, 37 M.J. 392 (C.M.A. 1993), which formed much of the basis for the subject instruction. *United States v. Gutierrez*, 74 M.J. 61, 68 (C.A.A.F. 2015). In *Gutierrez*, the CAAF found no authority for defining "'likely'" as "'more than merely a fanciful, speculative, or remote possibility'" and invalidated the risk of harm prong of the two-part analysis within the instruction. *Id.* at 66 (citing *Joseph*, 37 M.J. at 397). Instead, "likely" must be defined consistently for all Article 128, UCMJ, prosecutions, and not inconsistently with the "plain English" meaning of the word. *Id.* Further, the CAAF held that grievous bodily harm is likely when it is the "'natural and probable consequence'" of the particular act alleged. *Id.* (quoting *United States v. Weatherspoon*, 49 M.J. 209, 211 (C.A.A.F. 1998) (quoting MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (1995 ed.), Part IV, ¶ 54c(4)(a)(ii)). The Military Judges' Benchbook having not yet incorporated *Gutierrez* by the date of trial does not impact the plain or obvious error of instructing on the repudiated *Joseph* standard.[14]

### 2. *Material prejudice to a substantial right*

Next we consider whether the error materially prejudiced a substantial right of the appellant. The right to accurate members' instructions is substantial because, in cases such as this, it is Constitutional. An accused's right to a fair trial obligates a military judge to "'provide appropriate legal guidelines to assist the jury in its deliberations . . . .'" *United States v. Wolford*, 62 M.J. 418, 419 (C.A.A.F. 2006) (quoting *United States v. McGee*, 1 M.J. 193, 195 (C.M.A. 1975)). When an instruction contains "misdescriptions" of even a single element of an offense, "the erroneous instruction precludes the jury from making a finding on the *actual* element of the offense" and violates the Constitution's Sixth Amendment. *Neder v. United States*, 527 U.S. 1, 9-10, 12 (1999) (emphasis in original) ("[A]n improper instruction on

---

[13] Record at 1098-99; *see also* Military Judges' Benchbook, Dept. of the Army Pamphlet 27-9 at 735-36 (10 Sep 2014).

[14] The unofficial Military Judge's Benchbook published 12 September 2016, and incorporating changes made in February, May, and September 2016, reflects the deletion of the second paragraph of the instruction, including the two-factor analysis and the example. Military Judges' Benchbook, Dept. of the Army Pamphlet 27-9 at 738 (Unofficial ver. 16.2, 12 Sep 2016). *See United States v. Harcrow*, 66 M.J. 154, 159 (C.A.A.F. 2008) ("In undertaking our plain error analysis in this case, we therefore consider whether the error is obvious at the time of appeal, not whether it was obvious at the time of the court-martial.")

an element of the offense violates the Sixth Amendment's jury trial guarantee."); *see also United States v. Smith*, No. 201100594, unpublished op, 2012 CCA LEXIS 908, at *11 (N-M. Ct. Crim. App. 27 Dec 2012) ("[A] jury instruction which lessens to any extent the Government's burden to prove every element of a crime violates due process.") (citing *Francis v. Franklin*, 471 U.S. 307, 313-14 (1985)).

The ultimate, fact-specific question is whether error not only affected the substantial right to a fair trial, but also materially prejudiced it. *See United States v. Powell*, 49 M.J. 460, 465 (C.A.A.F. 1998). Further clarifying this standard, the CAAF espoused "the *Fisher* requirement that plain error have 'an unfair prejudicial impact on the jury's deliberations.'" *Id.* (quoting *United States v. Fisher*, 21 M.J. 327, 328 (C.M.A. 1986)).

Although we find the appellant's conviction to be factually sufficient, we recognize that the members largely relied on circumstantial evidence to determine that AMR's grievous bodily injuries resulted from the appellant's battery of AMR. Unlike the overwhelming proof that AMR was grievously injured, as defined by the law,[15] there was little direct evidence on the exact means by which the appellant caused those injuries. In finding the appellant guilty, the members most certainly relied on evidence the appellant had sole custody of AMR for the five to six hours before her seizures and respiratory arrest, his failure to summon emergency services, and the expert witness testimony citing trauma as the cause of her injuries. Nevertheless, when faced with circumstantial evidence of the actual force the appellant used and the lack of any relevant external injuries to AMR, the members had to assess the relationship among AMR's injuries, the appellant's means of harming his daughter, and whether those means were likely to produce death or a grievous bodily injury. Instead of being instructed on the "plain English" meaning of the word "likely,"[16] they were told to evaluate the risk of harm and advised that the threshold for the risk of death or grievous bodily harm need only be more than a fanciful, speculative, or remote possibility. At best, the members would have been confused by this instruction, and at worst, misled. Under the circumstances of this case, we are unable to conclude the members would have found the appellant guilty absent this error. Thus we find the instructional error materially prejudiced the appellant's substantial rights.

---

[15] Grievous bodily injury is defined as "serious bodily injury. It does not include minor injuries, such as a black eye or a bloody nose, but does include fractured or dislocated bones, deep cuts, torn members of the body, serious damage to internal organs, and other serious bodily injuries." MCM, Part IV, ¶ 54c(4)(a)(iii).

[16] *Gutierrez*, 74 M.J. at 66.

## C. Psychotherapist-Patient records

The appellant alleges the military judge erroneously denied production of BLS's mental health records for *in camera* review, because two psychotherapist-patient privilege exceptions applied in this case: (1) child abuse and (2) constitutional necessity.

In accordance with MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 513, SUPPLEMENT TO THE MANUAL FOR COURTS-MARTIAL (2012 ed.):

> A patient has a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication made between the patient and a psychotherapist or an assistant to the psychotherapist, in a case arising under the [UCMJ], if such communication was made for the purpose of facilitating diagnosis or treatment of the patient's mental or emotional condition.

Two of the eight exceptions to the privilege are relevant here: (1) "when the communication is evidence of child abuse or of neglect, or in a proceeding in which one spouse is charged with a crime against a child of either spouse;" and (2) "when admission or disclosure of a communication is constitutionally required." MIL. R. EVID. 513(d)(2),(8). To invoke an exception and secure production of privileged mental health records, a moving party must (1) "set forth a specific factual basis demonstrating a reasonable likelihood that the requested privileged records would yield evidence admissible under an exception to [MIL. R. EVID.] 513;" (2) proffer whether "the information sought [is] merely cumulative of other information available;" and (3) proffer whether "the moving party [made] reasonable efforts to obtain the same or substantially similar information through non-privileged sources[.]" *United States v. Klemick*, 65 M.J. 576, 580 (N-M. Ct. Crim. App. 2006).

The appellant moved to compel production of BLS's privileged mental health records, citing BLS's numerous mental health diagnoses discussed and disclosed at the Article 32, UCMJ, hearing and in discovery. Invoking the constitutional exception, the appellant argued he needed to determine whether BLS's conditions might "disrupt her memory, identity, or perception of the environment or otherwise make her dramatic, emotional, and erratic" and thus affect her credibility.[17] The military judge denied the motion.

On appeal, the appellant has challenged the military judge's decision that the constitutional exception did not apply and, for the first time, raised the child abuse exception. We begin our analysis with the child abuse exception.

---

[17] Appellate Exhibit (AE) II at 4-5.

*1. Child abuse exception*

The appellant failed to raise the MIL. R. EVID. 513(d)(2) child abuse exception before or at trial and therefore forfeited it. Thus we review the military judge's failure to invoke the exception *sua sponte* for plain error. *Powell*, 49 M.J. at 464; *see also Klemick*, 65 M.J. at 579. To find plain error, an appellant must demonstrate that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused. *Girouard*, 70 M.J. at 11. The military judge did not err by not ordering production of BLS's mental health records pursuant to the child abuse exception.

Considering the first *Klemick* factor, the appellant set forth no factual basis demonstrating a reasonable likelihood that there was evidence of child abuse in BLS's counseling records. Unlike the records sought in the *Klemick* case, where the incident of alleged child abuse precipitated the patient's counseling, BLS's counseling preceded the allegation of child abuse by at least a year. *See* 65 M.J. at 580 ("The death of a child at the hands of his father, followed soon thereafter by a discussion between the parents of the father's treatment of the child and then by psychological counseling for the child's mother, reasonably led to the conclusion that records of that counseling would contain information related to the event and the reactions of the victim's mother.")

The appellant was not a spouse charged with a crime against a child of either spouse. He and BLS never married. While one could logically argue that the child abuse exception should apply to unmarried as well as married parents when their child is the victim, the military judge committed no error in failing to extend the exception beyond its plain language.

Finding no error, we end our analysis of this exception.

*2. Constitutional exception*

The appellant raised constitutional necessity in his unsuccessful pretrial motion to compel production of BLS's mental health records. We review the military judge's decision to deny production of mental health records for *in camera* review for an abuse of discretion. *Klemick*, 65 M.J. at 580. "'An abuse of discretion arises in cases in which the judge was controlled by some error of law or where the order, based upon factual, as distinguished from legal, conclusions, is without evidentiary support.'" *United States v. Travers*, 25 M.J. 61, 63 (C.M.A. 1987) (quoting *Renney v. Dobbs House, Inc.,* 275 S.C. 562, 274 S.E. 2d 290, 291 (1981)).

During oral argument, trial defense counsel proffered that BLS exhibited borderline personality disorder symptoms. The appellant testified to observing: "[c]utting—self-cutting issues, depression—lot of depression, lot of anxiety, strong impulsive decisions especially with money, sometimes poor

hygiene" and mood swings.[18] No psychologist testified about borderline personality disorder, because the government had not yet responded to the appellant's request for an expert witness in this field. However, trial defense counsel failed to submit excerpts from the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, scholarly articles, or any other documentary evidence about the effects of borderline personality disorder. Instead, trial defense counsel proffered that those who suffer from the disorder "have significant departures from reality at times, [and] experience their own version of reality . . . ."[19]

Pointing to contradictions in BLS's testimony at the Article 32, UCMJ, hearing and her history of mental health treatment, the appellant also argued that he needed to mine BLS's mental health records for statements that might impeach her testimony on the merits or potential testimony during presentencing. The military judge dismissed these arguments as a fishing expedition, not a specific factual basis for piercing the privilege.

In his ruling, the military judge correctly spelled out the three requirements *Klemick* imposes on a party seeking privileged psychotherapist-patient communications. The military judge focused on the requirement of a "specific factual predicate" as a prerequisite to even an *in camera* review of privileged records.[20]

In his findings of fact, the military judge pointed to specific examples of inconsistencies in BLS's statements and Article 32, UCMJ, testimony. Specifically, she reported multiple allegations of assault and battery at the hands of the appellant in her 20 June 2014 statement but "did not tell the truth about any of the incidents she first reported on 20 June 2014 when those incidents initially occurred and she was questioned about them by medical, law enforcement, or other persons."[21] She denied suffering any abuse at the hands of her ex-husband despite evidence of a substantiated allegation of physical abuse against him in 2010. Finally, the military judge pointed to trial defense counsel's receipt of numerous medical records concerning BLS, evidence of her diagnosis of post-traumatic stress disorder, and the absence of evidence of any new diagnoses since her relationship with the appellant.

The military judge concluded that the appellant's speculation about what was protected in BLS's mental health records and its impact on her

---

[18] Record at 22.

[19] *Id*. 30.

[20] AE XI at 3.

[21] *Id*. at 4.

credibility fell short of "a specific factual showing as required by *Klemick*."[22] Despite the evidence that BLS suffered from one or more mental health conditions, the military judge specifically cited the absence of "documentary or testimonial evidence, that such conditions or the attendant diagnosis effect [sic] perception or memory."[23] Again finding no specific, factual support, he also rejected trial defense counsel's assertion that BLS's records contained statements needed to impeach her testimony on the merits and potentially, on sentencing. We find no error of law controlled the military judge's conclusions, and there was sufficient evidentiary support for his findings of fact. Thus, we find no abuse of discretion.

Near the end of the government's case, trial counsel disclosed to trial defense counsel that BLS had suddenly admitted to suffering from borderline personality disorder. Shortly thereafter, trial defense counsel called an expert psychologist who testified specifically about how borderline personality disorder manifests itself. This expert testimony arguably provided the specific factual basis missing from the appellant's pretrial motion. Because the appellant did not renew his motion for production of the privileged records again after the psychologist's testimony, there is no ruling from the presiding military judge. However, even with a more specific factual basis satisfying the first *Klemick* prong, the records sought were merely cumulative of other evidence already presented and thus do not satisfy the second *Klemick* prong. 65 M.J. at 580.

Trial defense counsel were able to explore BLS's multiple diagnoses and their effects and repeatedly impeach her credibility. After BLS confirmed her borderline personality disorder diagnosis, the appellant's expert psychologist explained its symptoms to the members. The psychologist pointed to BLS's own words in her journal as consistent with borderline personality disorder. In the privacy of her journal, BLS described herself as deceptive and manipulative: "I lie, manipulate others to get what I want, I'm selfish, 2 faced . . . ."[24] Trial defense counsel was able to elicit an admission that BLS lied at the Article 32, UCMJ, hearing to protect her ex-husband when she denied accusing him of physical abuse. BLS acknowledged she had begun living with her ex-husband again two weeks before the court-martial.

The constitutional necessity of examining BLS's mental health records diminished with each piece of non-privileged medical evidence, testimony, and written reflection challenging her credibility. Perhaps the best indicator of the appellant's successful impeachment of BLS, without her mental health

---

[22] *Id.* at 7.

[23] *Id.*

[24] PE 54 at 24.

records, is the verdict. The members convicted the appellant of the four specifications of assault preceding his texted confession of 15 November 2013. The only evidence of the alleged aggravated assault in December 2013 was BLS's testimony, and the members found her word alone insufficient. Again, we find no abuse of discretion in the sustained MIL. R. EVID. 513 privilege afforded to BLS's mental health records.

**D. Mistrial for inadmissible evidence**

The appellant avers error in the military judge's failure to grant a mistrial after the members briefly had access to inadmissible, prejudicial evidence.

"The decision to grant a mistrial rests within the military judge's discretion, and we will not reverse his determination absent clear evidence of abuse of discretion." *United States v. Rushatz*, 31 M.J. 450, 456 (C.M.A. 1990) (citing *United States v. Rosser,* 6 M.J. 267, 270-71 (C.M.A. 1979)). "[M]istrial is a drastic remedy, and such relief will be granted only to prevent a manifest injustice against the accused." *Id.* (citing *United States v. Pastor,* 8 M.J. 280, 281 (C.M.A. 1980)); *see also* RULE FOR COURTS-MARTIAL (R.C.M.) 915, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.) ("The military judge may, as a matter of discretion, declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings.") A military judge's most important consideration when ruling on a mistrial motion is the "'desires of and the impact on the defendant.'" *United States v. Thompkins*, 58 M.J. 43, 47 (C.A.A.F. 2003) (quoting *United States v. Harris*, 51 M.J. 191, 196 (C.A.A.F. 1999)). Given the drastic nature of a mistrial, courts prefer using a curative instruction as an alternative remedy. *Rushatz*, 31 M.J. at 456. The CAAF has often found a curative instruction "adequate to neutralize certain inadmissible evidence which might have prejudiced the accused." *United States v. Barron*, 52 M.J. 1, 5 (C.A.A.F. 1999) (citing *United States v. Balagna*, 33 M.J. 54 (C.M.A. 1991)). Members are presumed to have complied with a military judge's curative instructions absent evidence to the contrary. *Rushatz*, 31 M.J. at 456 (citations omitted).

In this case, a motion for mistrial arose because of the inadvertent, temporary admission of evidence previously deemed inadmissible under MIL. R. EVID. 404(b). When the government sought to admit evidence of uncharged misconduct within the appellant's incriminating text messages, the military judge found its probative value substantially outweighed by the danger of unfair prejudice.[25] Nevertheless, within minutes of the government's

---

[25] AE XIII at 4, 6.

publication of the text messages to the members, trial defense counsel realized that reference to the uncharged misconduct had not been redacted from the exhibit. After initially proposing a curative instruction, the appellant moved for a mistrial.

Having considered the totality of the circumstances, the military judge found a mistrial "not manifestly necessary in the interests of justice."[26] Among the circumstances cited were the trial defense counsel's failure to detect the inadmissible reference when the exhibit was admitted into evidence and its relative inconspicuousness within the lengthy exchange of text messages.

The military judge then deferred to trial defense counsel for corrective measures. At trial defense counsel's request, the government replaced the exhibit depicting screen shots of the text messages with a typed transcript. The transcript did not contain a black box of redacted text that might remind members of what had been removed. The military judge also invited trial defense counsel to draft a curative instruction, which he read to the members twice. The appellant offers no evidence rebutting the presumption that the members complied with the curative instruction.

The military judge applied the correct standard in finding a mistrial unnecessary to prevent manifest injustice. He read trial defense counsel's preferred curative instruction to the members on two separate occasions. The corrective measures taken were more than adequate to mitigate the error and protect the fairness of the trial. The appellant has failed to demonstrate that the military judge abused his discretion.

## E. Severance of charges

The appellant alleges that denial of his motion to sever the specifications with separate victims resulted in actual prejudice and deprived him of a fair trial.

We review a military judge's decision to deny a motion to sever offenses for an abuse of discretion. *United States v. Southworth*, 50 M.J. 74, 76 (C.A.A.F. 1999). An accused may file a motion for "severance of offenses, but only to prevent manifest injustice." R.C.M. 906(b)(10). "Ordinarily, all known charges should be tried at a single court-martial. Joinder of minor and major offenses, or of unrelated offenses is not alone a sufficient ground to sever offenses." R.C.M. 906(b)(10), Discussion.

Denial of a motion to sever offenses does not constitute an abuse of discretion unless the accused can show "actual prejudice in that it prevented him from receiving a fair trial; it is not enough that separate trials may have

---

[26] Record at 715.

provided him with a better opportunity for an acquittal." *United States v. Duncan*, 53 M.J. 494, 497-98 (C.A.A.F. 2000) (citations omitted).

To determine if denial caused actual prejudice by depriving the appellant of a fair trial, we consider three factors: "(1) whether the evidence of one offense would be admissible proof of the other; (2) whether the military judge has provided a proper limiting instruction; and (3) whether the findings reflect an impermissible crossover." *Southworth*, 50 M.J. at 76 (citing *United States v. Curtis*, 44 M.J. 106, 128 (C.A.A.F. 1996) *rev's as to sentence on recon.,* 46 M.J. 129 (C.A.A.F. 1997) (additional citations omitted)).

*1. Would evidence of one offense be admissible proof of the other?*

Evidence of the offenses against BLS would not be admissible to prove the offense against AMR and *vice versa*. However, finding that this first factor favors the appellant, alone, does not require severance, because a proper instruction from the military judge can address this concern. *Duncan*, 53 M.J. at 498 (citing *Southworth*, 50 M.J. at 77-78).

*2. Did the military judge provide a proper limiting instruction?*

The military judge provided the standard spillover instruction as a proper limiting instruction to the members.[27] As the appellant points out, the previous military judge who ruled on the severance motion mentioned the need for "a specific, tailored limiting instruction to prevent impermissible crossover."[28] While finalizing the findings instructions, the military judge addressed this with trial defense counsel: "[Y]ou'd like me to tailor it to specifically mention that the evidence that the accused committed an offense against one alleged victim does not constitute evidence that he would have assaulted the second victim, and put it in terms of separating victims, is that correct?"[29] Trial defense counsel agreed. Beyond the verbatim Military Judges' Benchbook's spillover instruction, the military judge added the following: "Proof that the accused committed assault against one person does not give rise to permit any inference that the accused assaulted anyone else."[30] Thus, the instruction addressed impermissible crossover using the standard, approved language as well as the appellant's requested language.

*3. Do the findings reflect an impermissible crossover?*

The appellant argues that his conviction for aggravated assault of AMR reflects impermissible crossover. We disagree. It is true that the government's presentation of evidence at court-martial did not perfectly

---

[27] *Id*. at 1107-09.

[28] AE XII at 7.

[29] Record at 1044.

[30] *Id*. at 1109.

segregate the specifications involving AMR from those involving BLS, and trial counsel did imply that the appellant lost control while handling AMR. But amidst all the evidence of the dysfunctional relationship between the appellant and BLS, there was no evidence that the appellant reacted to his daughter with anything like the frustration that characterized his interactions with her mother.

Although our ruling on instructional error moots any alleged prejudice, we nevertheless find the denial of the appellant's motion to sever did not give rise to actual prejudice that denied the appellant a fair trial.

## F. Cruel and unusual punishment in post-trial confinement

The appellant asserts he has received inadequate medical treatment during post-trial confinement, constituting cruel and unusual punishment in violation of the Eighth Amendment to the Constitution and Article 55, UCMJ.

Prohibitions against the infliction of "cruel and unusual punishment" derive from the Constitution and the UCMJ. U.S. CONST. amend. VIII; Art. 55, UCMJ.[31] The Supreme Court has interpreted "punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society . . . or which involve the unnecessary and wanton infliction of pain[,]" to violate the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (internal citations and quotation marks omitted); *see also United States v. Lovett*, 63 M.J. 211, 214 (C.A.A.F. 2006).

But before prisoners may seek judicial intervention in their allegations of cruel and unusual punishment, they must exhaust administrative remedies. *United States v. Miller*, 46 M.J. 248, 250 (C.A.A.F. 1997); *United States v. Coffey*, 38 M.J. 290, 291 (C.M.A. 1993) ("In this regard appellant must show us, absent some unusual or egregious circumstance, that he has exhausted the prisoner grievance system of the [confinement facility] and that he has petitioned for relief under Article 138, UCMJ . . . .") (citation omitted)). "In addition to promoting resolution of grievances at the lowest possible level, the exhaustion requirement in *Coffey* is intended to ensure that an adequate record has been developed with respect to the procedures for considering a prisoner grievance and applicable standards." *Miller*, 46 M.J. at 250.

In this case, the appellant has failed to demonstrate that he has exhausted his administrative remedies. By his own admission, he has not

---

[31] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII; "Punishment by flogging, or by branding, marking, or tattooing on the body, or any other cruel or unusual punishment, may not be adjudged by a court-martial or inflicted upon any person subject to this chapter." Art. 55, UCMJ.

forwarded his complaints to his commanding officer, pursuant to Article 138, UCMJ, or the confinement facility's grievance procedures. His rationale does not rise to the level of unusual or egregious circumstances. In his affidavit, the appellant claimed he feared the Technical Director would intercept and dismiss his complaint, as occurred with a prior grievance involving incoming mail. However, the appellant has failed to show us that he has even addressed a complaint to his commanding officer. Therefore, the appellant has not made the required showing for relief from this court.

## G. Unreasonable multiplication of charges

The appellant next alleges the military judge erred in denying his motion to dismiss one or more specifications of assault of BLS for unreasonable multiplication of charges.

We review a military judge's decision to deny relief for unreasonable multiplication of charges for an abuse of discretion. *United States v. Campbell*, 71 M.J. 19, 22 (C.A.A.F. 2012).

Like the appellant, we turn to *United States v. Quiroz*, 55 M.J. 334 (C.A.A.F. 2001) for the factors guiding our analysis:

> (1) Did the appellant object at trial that there was an unreasonable multiplication of charges and/or specifications?;
>
> (2) Is each charge and specification aimed at distinctly separate criminal acts?;
>
> (3) Does the number of charges and specifications misrepresent or exaggerate the appellant's criminality?;
>
> (4) Does the number of charges and specifications [unreasonably] increase the appellant's punitive exposure?; and
>
> (5) Is there any evidence of prosecutorial overreaching or abuse in the drafting of the charges?

*Id*. at 338 (citing *United States v. Quiroz*, 53 M.J. 600, 607 (N-M. Ct. Crim. App. 2000)).

First, the appellant made an objection for unreasonable multiplication at trial, after the government rested its case.

Second, we consider whether Specifications 1, 2, and 3 under Charge II refer to separate and distinct acts.[32] The appellant argues that Specification 1

---

[32] Specification 1: In that [the appellant] . . . did, at or near Oak Harbor, Washington, on divers occasions from in or about February 2012 to in or about September 2012, unlawfully touch [BLS] on the head, neck, arms, legs, and torso with his arms, hands, legs, and feet.

alleged a course of conduct broad enough to include the assaults alleged in Specifications 2 and 3. However, Specifications 2 and 3 alleged specific assaults for which the government submitted documentary evidence in corroboration. BLS testified that the more egregious assault to her face and head in May 2012, alleged in Specification 2, was the first altercation that left her with a black eye. She authenticated a photograph she took of the black eye in May 2012. Specification 3, which alleged a pushing incident that occurred near South Padre Island, Texas, was necessarily a distinct act because it occurred at a different situs— than the assaults described in Specifications 1 and 2.

Third, because Specification 3 addresses a separate assault, which also caused distinct harm to BLS,[33] it neither misrepresents nor exaggerates the appellant's criminality.

Fourth, the number of specifications did not unreasonably increase the appellant's punitive exposure. Each specification increased the maximum confinement by six months, resulting in a significant proportional increase with each additional specification. However, Specifications 2 and 3 were distinct assaults which reasonably increased the appellant's punitive exposure. Moreover, the appellant already benefitted from reduced punitive exposure from Specification 1 itself, as the government could have charged other individual assaults within this specification as separate specifications, rather than consolidating them in Specification 1. This reduced the appellant's punitive exposure. *See Campbell*, 71 M.J. at 25 (finding no abuse of discretion in the military judge's refusal to dismiss charges for possessing and stealing the same narcotics, on the same divers occasions, as "[t]he Government's decision to charge on divers occasions only exposed [Campbell] to eleven years of confinement[,]" thereby reducing "rather than exaggerating [her] criminality or exposure," as she "could have faced thirty-one separate specifications of larceny" and "thirty-one years of confinement.")

Fifth, there is no evidence of prosecutorial overreach or abuse in charging. The aforementioned decision to consolidate in Specification 1 all but two of the assaults in an eight-month pattern of physical abuse, weighs against any allegation of overreach or abuse.

---

Specification 2: In that [the appellant] . . . did, at or near Oak Harbor, Washington, in or about May 2012, unlawfully strike [BLS] in her face and head with his hand. .

Specification 3: In that [the appellant] . . . did, at or near South Padre Island, Texas, in or about June 2012, unlawfully push [BLS] on her body with his hands.

[33] The government presented hospital records documenting injuries to BLS's elbow, which she attributed to the appellant's assault described in Specification 3.

For these reasons, we find the military judge did not abuse his discretion in denying the appellant's motion to dismiss any specification for unreasonable multiplication of charges.

## H. Instruction regarding a finding of guilty

The appellant avers error in the military judge's instruction to members that, "[i]f, based upon your consideration of the evidence, you are firmly convinced that the accused is guilty of the crime charged, you must find him guilty."[34]

We found no error in the use of the same challenged reasonable doubt instruction in *United States v. Rendon*, 75 M.J. 908, 917 (N-M. Ct. Crim. App. 2016), *petition for rev. filed*, __ M.J. __, No. 17-0168/MC (C.A.A.F. Dec. 30, 2016), and in accordance with that holding, we summarily reject this AOE as meritless. *United States v. Clifton*, 35 M.J. 79, 81 (C.M.A. 1992).

## I. Multiplicity

The appellant argues Specifications 1 and 2 of Charge II are multiplicious because Specification 2 describes one specific act (unlawfully striking BLS in the face and head with his hand in or about May 2012) that is encapsulated in Specification 1 (on divers occasions unlawfully touching BLS on the head, neck, arms, legs, and torso with his hands, legs, and feet from February 2012 to in or about September 2012).

Whether two offenses are multiplicious is a question of law that we review *de novo. United States v. Anderson,* 68 M.J. 378, 385 (C.A.A.F. 2010). But when an appellant fails to raise the issue at trial, he forfeits any error unless he can show plain error. An appellant may show plain error by showing that the specifications at issue are "facially duplicative, that is, factually the same." *United States v. Michelena*, No. 201400376, 2015 CCA LEXIS 463, at *4, unpublished op., (N-M. Ct. Crim. App. 29 Oct 2015) (quoting *United States v. Heryford*, 52 M.J. 265, 266 (C.A.A.F. 2000)). "Whether specifications are facially duplicative is determined by reviewing the language of the specifications and facts apparent on the face of the record." *Id.* (citations and internal quotation marks omitted).

The appellant did not raise a multiplicity objection at trial.[35] Thus we assess for plain error, and whether the appellant has met his burden to

---

[34] Record at 1110-11.

[35] Although the appellant, at trial, characterized Specification 1 of Charge II as a "catchall" and asked the military judge to dismiss it, he did so in the context of an R.C.M. 917 motion for a finding of not guilty. He did not raise the issue of multiplicity, or otherwise implicate R.C.M. 907(b)(2). Record at 958. *See Payne*, 73 M.J. at 22-23 (reviewing the military judge's instructions regarding the elements of

demonstrate that Specifications 1 and 2 are factually the same. We find he has not.

Specification 1 alleges the appellant, on divers occasions from February 2012 to in or about September 2012, did "unlawfully touch [BLS] on the head, neck, arms, legs, and torso with his arms, hands, legs, and feet."[36] Specification 2 alleges the appellant did, in or about May 2012, "unlawfully strike [BLS] in her face and head with his hand."[37] The specifications are obviously not factually identical. Although the dates and location in Specification 2 overlap with those in Specification 1, the singular event of the appellant striking BLS *in* her face and head with his hand is factually different than the divers touching *on* the various parts of her body. These factual differences were addressed by BLS in her testimony. She described a pattern of abuse, starting in February 2012, occurring "a couple times a month" wherein the appellant would hit or kick her "in places that could be covered up with clothing: my legs, my arms, my back, [and my] shoulders . . . ."[38] She further testified to a separate incident in which the appellant "punched the back of my head, and then I turned and he ended up giving me a black eye."[39] She explained this was the first time he struck her and left a visible injury that she could not cover with clothing or attribute to an accident. She specifically testified this particular assault occurred in May 2012. We have no difficulty concluding this separate incident comprised the evidence the members used to convict the appellant on Specification 2 of Charge II.[40]

---

one specification of a charge for plain error, where trial defense counsel had lodged a "general objection" to the specifications of a charge, which did not "identify which specification or specifications he was referring to or which elements he felt the military judge should have instructed on"). Likewise, the appellant did not raise the issue of multiplicity in his initial brief, or in his three, separate supplemental assignments of error.

[36] "Specification 1: In that [the appellant] . . . did, at or near Oak Harbor, Washington, on divers occasions from in or about February 2012 to in or about September 2012, unlawfully touch [BLS] on the head, neck, arms, legs, and torso with his arms, hands, legs, and feet."

[37] "Specification 2: In that [the appellant] . . . did, at or near Oak Harbor, Washington, in or about May 2012, unlawfully strike [BLS] in her face and head with his hand."

[38] Record at 693-94.

[39] *Id.* at 699.

[40] We are equally convinced the members correctly applied the evidence to the appropriate specification. When instructing the members, the military judge correctly ensured that he did not use the word "face" when describing Specification 1

We are unpersuaded by the appellant's reliance on *United States v. Maynazarian*, 31 C.M.R. 70, 72 (C.M.A. 1961), in which our superior court held it was "improper for the government to seek, at one and the same time, to charge an accused with a general course of misconduct over a stated period and select from that [misconduct] a specific act to be alleged as a separate offense". (Citations omitted). Multiplicious dates do not necessarily result in multiplicious specifications. Although Maynazarian was charged, like the appellant, with two UCMJ specifications in which the second specification described an offense occurring on a single date that fell within a five-month date period contained in the first specification, the similarities end there. Maynazarian was charged with embezzlement larceny offenses, in which the separately charged larceny was in fact "part and parcel of the former." The court found the record "devoid of *any* evidence demonstrating the two charged offenses were separate." *Id.* at 485. (emphasis added.) Not so here, where the record clearly supports that Specification 2 was a separate and distinguishable assault upon BLS.

Even assuming *arguendo* that the appellant did not forfeit the multiplicity issue, we remain convinced in *de novo* review that Specification 1 and 2 were not multiplicious. A primary question in resolving multiplicity issues is whether the charged offenses "amount to the 'same act or course of conduct' or whether they are distinct and discrete acts, allowing separate convictions." *United States v. Paxton*, 64 M.J. 484, 490 (C.A.A.F. 2007) (quoting *United States v. Teters*, 37 M.J. 370, 373 (C.M.A. 1993)) (additional citation omitted). We find, for the same reasons discussed *supra,* that striking BLS in the face during May of 2012 was a distinct and discrete act from the offenses described in Specification 1. Here, Specification 2 requires proof of a fact that Specification 1 does not—that the appellant struck BLS in the face. "[S]imply because two offenses violate the same statute or law does not make them the same offense as a matter of fact[.]" *United States v. Neblock*, 45 M.J. 191, 196, (C.A.A.F. 1996). There being no evidence that the appellant's punching BLS's face in May 2012 was part of the same acts or course of conduct alleged in Specification 1, we find no multiplicity in the appellant's convictions under Specifications 1 and 2 of Charge II.

### III. CONCLUSION

The guilty finding to Specification 5 under Charge II and the sentence are set aside. The remaining findings are affirmed. The record is returned to the

---

and omitted the word "head" when describing Specification 2, advising the members the *actus reus* of Specification 2 was "striking her in the face with his hands." Record at 1093; AE XXXII at 2. When afforded an opportunity by the military judge, the appellant did not object to these instructions. Record at 1042-44. Moreover, the military judge provided an appropriate spillover instruction. *See* II(E), *supra.*

Judge Advocate General of the Navy for remand to an appropriate convening authority with a rehearing on the set aside conviction and sentence or on the sentence alone is authorized. Art. 66(d), UCMJ.

MARKS, SJ, concurring in part and dissenting in part:

I respectfully dissent from the majority's opinion with regard to the second Assignment of Error (AOE), (Part II, Section A), and the factual sufficiency of the appellant's conviction of assault with means or force likely to produce death or grievous bodily harm. Instead of setting aside the conviction of Charge II, Specification 5, and authorizing a rehearing, I would affirm the conviction only in so far as it includes the lesser included offense of assault consummated by battery of a child and reassess the sentence to 18 months' confinement and a bad-conduct discharge. I concur with the majority on the remaining AOEs.

## A. Factual sufficiency of assault with means likely to produce death or grievous bodily harm

Having reviewed the evidence *de novo*, *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002), and "weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," I am not "convinced of the [appellant's] guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).[1]

As the majority implies, the prosecution in this case relied almost entirely on the circumstantial evidence of AMR's injury. I concur with the majority that the forensic evidence and testimony of the doctors, radiologists, and medical experts constitute overwhelming proof that AMR suffered grievous harm to her brain. The appellant's sole custody of AMR for five to six hours before she showed signs of distress is more than adequate evidence that he is responsible for her injury. The who, what, when, and where regarding the injuries are relatively clear. But as the government's child abuse expert testified, injury alone does not prove child abuse. Evidence of the how and why is necessary. But such evidence is insufficient in this case, at least with regards to means or force likely to produce death or grievous bodily harm.

First, the government never articulated, with any particularity, the means or force the appellant used. The specification alleging aggravated assault of AMR accused the appellant of "moving her with his body."[2] In his opening statement, assistant trial counsel previewed his case: AMR suffered

---

[1] Having found the evidence factually insufficient, we need not address legal sufficiency.

[2] Charge Sheet, Charge II, Specification 5.

an injury, and by process of elimination, the appellant is the person who "did it to her."[3] Even after presenting all its evidence, the government still stopped short of specifying a manner in which the appellant moved AMR. Trial counsel repeatedly cited the diagnosis of "trauma"[4] and referred vaguely to the appellant's "actions,"[5] accusing him of "inflict[ing]" AMR's injuries,[6] "caus[ing] brain damage to his daughter,"[7] and "hurt[ing]"[8] her.

AMR's injuries revealed no more definitive evidence. Absent were the retinal hemorrhages, bruises (other than to her eyelid), cracked ribs, and spiral fractures that often indicate how someone has mishandled a child. All of the doctors who testified identified non-accidental trauma as the most likely source of AMR's subdural hemorrhage or hematoma, but many explained that the diagnosis was made by process of elimination. A pediatrician who specializes in child abuse testified that the most common non-accidental trauma resulting in subdural hematoma was "acceleration/deceleration injury . . . kind of akin to whiplash. It's kind of what you may commonly think [sic] as shaking."[9] But then she qualified her use of the word "shaking" by saying, "I've had some cases with [histories] of very creative ways to cause that type of motion to a baby's head, so there's no classic one way to do it."[10]

Other than the appellant, there were no witnesses to what caused AMR's injuries. While her four-year-old half-brother was home at the time, there is no evidence that he reported hearing AMR cry or seeing anything. Only BLS's father testified to ever having seen the appellant handle AMR inappropriately: "one time [AMR] was fussing, and [the appellant] did grab her by the chin and shake her and shush her a little bit, which I thought was a little—little rough for a 6-week-old baby. That was—that's the only thing I noticed."[11] No one testified to witnessing the appellant shout or vent his frustrations at AMR. Instead, the government cited his sleep deprivation and regular consumption of energy drinks, the stress of his upcoming move to Hawaii, and his inexperience as a father as evidence he lost control with his

---

[3] Record at 217.

[4] *Id.* at 1048, 1050, 1052.

[5] *Id.* at 1048.

[6] *Id.*

[7] *Id.* at 1049.

[8] *Id.* at 1054.

[9] *Id.* at 464.

[10] *Id.* at 465.

[11] *Id.* at 877.

daughter. They offered no confession or admissions from the appellant,[12] only the recording of his 3 November 2013 interview with the civilian investigators. While trial counsel challenged aspects of the appellant's account and questioned some of his actions, they failed to discredit them entirely.

We have no evidence of how vigorously or violently the appellant moved his daughter's body beyond what we can infer from her one-time injury. As the majority states *supra*, circumstantial evidence is admissible on that point. It allows us to conclude with confidence that the appellant moved AMR with a means or force that *resulted* in her grievous bodily injury. But that is not enough. Likelihood of death or grievous injury from the means or force used is also an element of this offense. According to the government's child abuse expert, "when a baby undergoes a—a trauma like some sort of shaking, the brain kind of *can* move inside the skull. . . . It *can* cause injury to the brain tissue, it *can* cause blood vessels to break and to bleed, things like that."[13] Just because something can happen does not necessarily mean it is likely to happen. "[S]eizures aren't in every case of head trauma, but they do occur in a good number of cases of head trauma."[14] While a "good number" is more than a possibility, we do not have any evidence the expert equated it to a likelihood. To find the evidence factually sufficient to affirm this conviction, we have to extrapolate the nature of the means or force the appellant used *and then* predict the probable, not just possible, outcome of its repeated use. I do not believe the evidence in this case carries us across both of those hurdles.

## C. LIO of assault consummated by battery

Although I find the evidence of aggravated assault with means or force likely to produce death or grievous bodily harm factually insufficient, I would "'affirm . . . so much of the finding as includes a lesser included offense.'" *United States v. Upham*, 66 M.J. 83, 87 (C.A.A.F. 2008) (quoting Article 59(b), UCMJ); *see also United States v. McKinley*, 27 M.J. 78, 79 (C.M.A. 1988) (noting that when "proof of an essential element is lacking," an appellate court "may substitute a lesser-included offense for the disapproved findings.").

The elements of the lesser included offense (LIO) of assault consummated by battery upon a child under 16 years are:

---

[12] The appellant's incriminating texts addressed assaults of his then-girlfriend, BLS, and made no mention of their daughter. Prosecution Exhibit 1.

[13] Record at 465 (emphasis added).

[14] *Id.* at 467.

One, that on or about 2 November 2013, at or near Oak Harbor, Washington, the accused did bodily harm to [AMR];

Two, that the accused did so by moving her with his body;

Three, that the bodily harm was done with unlawful force or violence; and

Four, that [AMR] was a child under the age of 16 years.[15]

Missing is the element about use of means or force likely to produce death or grievous bodily harm. Instead, battery must be committed with intent or culpable negligence.[16] As the appellant was acquitted of intending to harm AMR, we focus on culpable negligence. A culpably negligent act is one "accompanied by a culpable disregard for the foreseeable consequences to others of that act or omission."[17] Notably, a foreseeable consequence of an act is not necessarily a natural and probable consequence of that act.[18]

According to the appellant's interview, he patted and shook his daughter to clear her airway after she vomited formula. Although a new father, he understood not to shake her hard: "I don't mean like rough like shaking her or anything like that. . . . I would never do that . . . ."[19] But he did shake or move AMR hard enough to cause her brain injury. Whether he acted out of frustration or panic, he disregarded his understanding of the risk and acted in a way he could have reasonably foreseen could cause her injury.

While I do not believe the evidence supports the inference that the appellant acted with a means or force that would probably cause death or grievous bodily harm, I do believe it is sufficient to infer that the injury was a foreseeable consequence of his means or force. Therefore, I would affirm only so much of the finding of Charge II, Specification 5, as constitutes assault consummated by battery of a child.[20]

---

[15] Record at 1100; MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.) (MCM), Part IV, ¶ 54b.

[16] MCM, Part IV, ¶ 54c(2)(d).

[17] MCM, Part IV, ¶ 44c(2)(a)(i); *see United States v. Mayo*, 50 M.J. 473, 474 (C.A.A.F. 1999) (applying the definition of culpable negligence in Article 119, UCMJ, manslaughter, to Article 128, UCMJ, assault.)

[18] MCM, Part IV, ¶ 44c(2)(a)(i).

[19] PE 4 at transcript page 572.

[20] The change in the finding to Charge II, Specification 5 moots the sixth AOE, the allegation of error in the report of results of trial with regard to this specification.

**D. Sentence reassessment**

Next I consider whether I would reassess the appellant's sentence, using the four factors in *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013):

(1) Dramatic changes in the penalty landscape and exposure.

(2) Whether an appellant chose sentencing by members or a military judge alone.

(3) Whether the nature of the remaining offenses captures the gravamen of criminal conduct included within the original offenses and, in related manner, whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses.

(4) Whether the remaining offenses are of the type that judges of the courts of criminal appeals should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial.

First, the maximum confinement for assault consummated by battery of a child is two years—vice five years for aggravated assault with means or force likely to produce death or bodily harm.[21] A sixty-percent reduction in exposure to confinement is dramatic. Second, the appellant chose sentencing by members, making reassessment of the sentence less predictable. Third, the remaining offenses are now all assaults consummated by battery. There is no longer an aggravated assault, but that change does not reflect any suppression of evidence. The culpability of the appellant has changed, but the gravamen of the injury to the child has not. Finally, the remaining offenses are of the type that the judges of this court can reliably determine what sentence would have been imposed at trial.

Considering the totality of the circumstances reflected in these four factors, I would reassess the sentence and reduce it from two years' confinement to 18 months' confinement.

CAMPBELL, SJ, concurring in part and dissenting in part:

I join in Parts I and II of the majority opinion, except for a portion of the unreasonable multiplication of charges analysis (Part II, Section G), and its holding on the specified issue (Part II, Section I). Respectfully, I find that Specifications 1 and 2 under Charge II are multiplicious. Consequently, without reaching whether they also represent an unreasonable multiplication

---

[21] MCM, App. 12, p. A12-5.

of charges, I would set aside the conviction for that second specification, with prejudice, within Part III of the majority opinion, in which I also join.

In *United States v. Maynazarian*, 31 C.M.R. 70, 71 (C.M.A. 1961) the court "recognized that a military accused could be charged with and found guilty of a single-act offense by alleging and finding a course of the same conduct between two dates. . . ." but also held "that a conviction under such broad pleadings would bar a second conviction at the same trial for a single-act offense within the charged period." *United States v. Neblock*, 45 M.J. 191, 199 (C.A.A.F. 1996) (citations omitted).

The members here were instructed, in part, that convicting the appellant of Charge II's non-aggravated assault specifications required that they be convinced beyond a reasonable doubt:

> In Specification 1: That on divers occasions from about February to about September 2012, at or near Oak Harbor, Washington, the accused did bodily harm to B. S.;
>
> Two: that the accused did so by striking her on the head, neck, arms, legs and torso with his arms, hands, legs and feet; and
>
> Three, that the bodily harm was done with unlawful force or violence.
>
> In Specification 2:
>
> That in or about May 2012, at or near Oak Harbor, Washington, the accused did bodily harm to B. S.;
>
> That the accused did so by striking her in the face with his hands; and
>
> Three, that the bodily harm was done with unlawful force or violence.[1]

Inexplicably, these findings instructions for Specifications 1 and 2 differed from the actual charge sheet, which, as amended, respectively alleged the appellant "did . . . unlawfully *touch* . . . [B.S.] on the head, neck, arms, legs, and torso with his arms, hands, legs, and feet" and "did . . . unlawfully strike . . . her face *and head* with his hand." (emphasis added). Responding to the defense motion to dismiss the specifications under RULE FOR COURTS-MARTIAL 917, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), the assistant trial counsel explained that "strike" was amended to "touch" in Specification 1 in order to describe more, not less, of the appellant's alleged misconduct—specifically, a neck-choking incident that might not be

---

[1] Record at 1093-94.

considered a strike—without indications that the amendment was to somehow differentiate the specifications.[2]

Like our superior court in *Maynazarian*, I "simply cannot disregard the fair probability that the second, specific . . . [assault consummated by battery] charged was embraced in the first general count." 31 C.M.R. at 72.[3] Regardless of the instructions removing "head" from the elements of the alleged May 2012 specific act and the fact that the face is part of the head,

---

[2] *Id.* at 961-62.

[3] *See also United States v. Thayer*, 16 M.J. 846, 847-48 (N-M.C.M.R. 1983) (modifying findings and reassessing the sentence when "the accused was convicted of wrongful sale of five pounds of marijuana from about March 1981 to about December 1981 (Charge II, specification 33), six wrongful sales of marijuana to a named individual within the same period of time or from March to August 1981 (Charge II, specifications 1 through 6), and a wrongful sale of marijuana to another named individual between March 1981 and August 1981 (Charge II, specification 20)," because "[t]he sales to the individuals named in specifications 1 through 6 and 20 of Charge II involved portions of the five pounds of marijuana specified in . . . specification 33 of Charge II" and thus were "multiplicious"); *United States v. Gill*, 37 M.J. 501, 509-10 (A.F.C.M.R. 1993) (finding a "multiplicity issue" arose when the court-martial members, through exceptions and substitutions of the alleged dates, convicted the appellant of committing "aggravated assault. . . on 13 December 1989, and . . . [separately committing] the same type of conduct against the same victim on divers occasions from 15 August 1989 to 13 December 1989" because "the individual offense [then] fell within the period of the 'course of conduct' offense") , *rev. denied*, 39 M.J. 376 (C.M.A. 1994); *United States v. Stephenson*, 25 M.J. 816, 816-17 (A.F.C.M.R. 1988) (setting aside and dismissing five specifications, which each alleged possession of the same drug in the same vicinity on "specific dates," as multiplicious for findings with the remaining specification, that "alleged a five month period which encompassed the times alleged in all of the five other specifications. . . . [because it] is improper . . . to go to findings on both the specific-series specifications and the related umbrella specification") (citations and internal quotation marks omitted), *rev. denied*, 26 M.J. 224 (C.M.A. 1988);. *Cf. United States v. Dorflinger*, No. ACM 38572, 2015 CCA LEXIS 326, at *8 n.4, unpublished op. (A.F. Ct. Crim. App. 11 Aug. 2015) ("Since both specifications alleged a single use [of morphine], this case does not present the former jeopardy problem that arises when a specification alleging misconduct on divers occasions over a period of time overlaps with another specification alleging the same offense during the period of time covered by the divers occasions specification.") (citation omitted) , *rev. denied*, 75 M.J. 110 (C.A.A.F. 2015).

Specification 2 is encapsulated within Specification 1 based on the language alleged in the charge sheet.[4]

For the Court



R.H. TROIDL
Clerk of Court

---

[4] No further multiplicity analysis is required. But to the extent that the majority opinion seemingly blends multiplicity and unreasonable multiplication of charges by analyzing whether there was evidence of the specific offense alleged in Specification 2, as the appellant points out, "[t]he government did not argue . . . nor were there any instructions . . . that the face punch should only be considered for Specification 2, and not for Specification 1." Appellant's Brief on Specified Issue of 19 Dec 2016 at 4.