UNITED STATES, Appellee,

v.

Monty J. HARRIS, Sergeant,
U.S. Army, Appellant.

No. 98–0914.
Crim.App. 9401997.

U.S. Court of Appeals for
the Armed Forces.

Argued May 11, 1999.

Decided Aug. 2, 1999.

CRAWFORD, J., delivered the opinion of the Court, in which COX, C.J., and SULLIVAN, GIERKE, and EFFRON, JJ., joined.

For Appellant: *Captain Donald P. Chisholm* (argued); *Colonel John T. Phelps, II, Lieutenant Colonel Adele H. Odegard,* and *Captain Kirsten V. Campbell–Brunson* (on brief); *Major Holly S.G. Coffey* and *Captain Paul Fiorino.*

For Appellee: *Captain Daniel G. Brookhart* (argued); *Colonel Russell S. Estey, Lieutenant Colonel Eugene R. Milhizer, Major Patricia A. Ham* (on brief); *Captain Troy A. Smith.*

Judge CRAWFORD delivered the opinion of the Court.

Contrary to his pleas, appellant was convicted of 2 specifications of rape, 3 specifications of committing indecent acts with a child, 1 specification of taking indecent liberties with a child, and 1 specification of forceful sodomy of a child, in violation of Articles 120, 134, and 125, Uniform Code of Military Justice, 10 USC §§ 920, 934, and 925, respectively. The convening authority approved the sentence of a dishonorable discharge, 30 years' confinement, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed without opinion. We granted review of the following issues:

I

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION WHEN HE FAILED TO DECLARE A MISTRIAL AFTER THE GOVERNMENT IMPROPERLY ELICITED INADMISSIBLE CREDIBILITY TESTIMONY AND UNCHARGED MISCONDUCT EVIDENCE FROM A CRITICAL PROSECUTION WITNESS.

II

WHETHER THE CUMULATIVE EFFECT OF ERRORS DURING APPELLANT'S COURT–MARTIAL DENIED APPELLANT A FAIR TRIAL.

For the reasons set forth below, we affirm the decision of the Court of Criminal Appeals.

Appellant contends that the military judge should have *sua sponte* declared "a mistrial when the prosecutor repeatedly asked questions relating to the victim's credibility and improperly elicited uncharged misconduct evidence from Dr. Ellen Speyer." Final Brief at 4.

## FACTS

### *Improper Credibility Evidence*

It was clear from the onset of trial that the military judge was aware of and sensitive to the limitations surrounding expert testimony in sexual abuse cases concerning stress syndromes. Before the members heard any evidence, the military judge repeatedly cautioned counsel against improper indications or questioning designed to show impermissibly that this victim was credible. Those cautions, as well as assurances by trial counsel, follow:

MJ: And do you [TC] expect to ask her [Dr. Speyer] a question or to proffer evidence that she says after having investigated this matter, I think [K] is truthful and her story believable?

TC: Your Honor, we're aware of the case law involving the human lie detector and we will ask questions consistent with the case law.

MJ: [*United States v.*] *Suarez*[, 35 MJ 374 (CMA 1992),] is the case you need to look [a]t.

\* \* \*

MJ: See, here's the problem that everybody's having and I know you guys have read *Suarez*, but not this woman, Mrs. [C], or any doctor's going to come in here and say, "I believe [K]" or "I don't believe [K]." I mean, I'm not allowing anybody to do that.

\* \* \*

MJ: Okay. And we are specifically excluding Dr. Speyer or any other person to be a witness as to the truth or veracity of [K], is that correct?

\* \* \*

MJ: I don't want to simply go on other cases because every case is different. Why should I give a forensic examination of this witness, when A—of [K], when A, the witness cannot testify as to the truth or give their opinion,. . . .

\* \* \*

MJ: All right. If there's anything else [Dr. Speyer will testify to], Captain [M] [sic], let him know.

TC: We abide by the rules, Your Honor.

\* \* \*

MJ: And that's the ticket. And I will not permit any witness to come in here, okay, and talk about whether or not they believe or how to believe a witness based upon something like that. The members will watch her demeanor. The members will listen to her testimony. And the members will determine her believability.

\* \* \*

MJ: Does he have any—yeah, that's right. Does he have any expertise on why—on how people should believe children based upon their demeanor?

TC: Yes, he does, Your Honor.

MJ: He does? There's a body of scientific information that when a child does a certain thing they're believable or less believable?

TC: Sir, it's the best education of all, experience. He had—he can establish his experience over 10 years, I believe, in this work.

MJ: And say "My experience is is [sic] that [K]'s believable and—though some children aren't?"

TC: No, Your Honor. We will not ask that line of questioning as we're aware of the case law.

Despite these cautions and despite his assurances, trial counsel ventured into the prohibited area, more than once, with several witnesses:

TC: Do you believe that [K] is a [sic] honest person?

A [Mrs. L, teacher]: Very much so.

TC: Has she ever given you any reason to question her credibility?

DC: Asking for specific instances, Your Honor.

MJ: Sustained.

TC: Do you have any reason to question [K]'s credibility?

A: I would trust [K] with my wallet, my purse, anything. I mean she's a – – – –

MJ: Yeah. Talk to me.

DC: The bell's been rung, Your Honor.

MJ: Do you object?

DC: Not at this—no, sir. Not at this point.

\* \* \*

TC: When you were questioning the accused, what was his demeanor?

A [Special Agent (of the Criminal Investigation Command) Reid]: He appeared to me to be evasive, sir. He rendered physical signs of crossing his arms.

DC: Objection, Your Honor.

MJ: Sustained.

\* \* \*

MJ: [Y]our objection is sustained. Members will disregard evasive or any of those other things that go to whether or not this witness's opinion is the person was truthful or not. You may have the witness describe physical characteristics.

TC: Yes, sir.

MJ: Okay. From which the members if they wish, can come to a conclusion. But I will not let anyone ask a witness the truth question.

TC: Understood, sir.

* * *

TC: Did her demeanor seem appropriate for somebody who was claiming that they'd been sexually molested?

A [Dr. Nataraj, Pediatrician]: Yes.

DC: Your Honor?

MJ: Sustained. Members, you'll disregard the question and the answer. You won't ask another question like that. The members are advised that it's your opinion in the form of your verdict that counts. You may ask her about the witness' demeanor, but you will not ask this or any witness a conclusion like that.

TC: Yes, sir. . . .

* * *

TC: [C]ould you describe for the panel the progression of the treatment that you provided [K]?

A [Dr. Speyer]: Okay.

DC: Relevance, Your Honor.

TC: It goes directly to [K]'s treatment and her credibility, sir. It an all—

DC: 39(a), Your Honor.

* * *

[Session under Article 39(a), UCMJ, 10 USC § 839(a), convened]

MJ: . . . Why did you, in the presence of these members, use the words [K]'s credibility?

TC: Misstatement, Your Honor.

MJ: I'm tired of your misstatements. I'm tired of the Government's misstatements. How many times do I have to tell you and tell the members that the credibility issue is solely to the members? We have talked about the *Suarez* case till I'm sick of talking about it. I've pointed out that instruction a thousand times. How many times do you want to try this case, Captain [B]? Cause you're so damn close to a mistrial, that you're about to try [it] all over again if you want to. Is that what you want?

TC: No, sir.

MJ: Do you want to put the [C] family, the [H] family and all these witnesses through this again?

TC: No, I do not, Your Honor.

MJ: Do you want to go to jail personally?

TC: I do not, Your Honor.

MJ: Okay. Your [sic] damn close, and I'm beginning to believe it isn't a mistake, got it?

TC: Got it, sir.

At this point, the military judge assured himself that Dr. Speyer understood the permissible limits of her testimony:

Would you please, and in case that we have another error, and I throw Captain [B] out and cause Captain [K] to fix up—pick up the direct examination, will you be very clear to make it understood that you are not giving your opinion as to whether or not you believe whether or not abuse occurred?

When the members returned, the military judge gave the members "a preview" of Dr. Speyer's testimony and described for them the permissible manner in which the testimony could be considered.

### Uncharged–Misconduct Evidence

When trial counsel asked Dr. Speyer how K's "treatment progressed," Dr. Speyer responded, "Okay. [K] and her mother both verbalized a lot of concern. They talked about threats being made by the accused perpetrator against the family." Defense counsel made a general objection which was sustained on the basis of hearsay. The military judge directed the members to disregard the testimony.

At the request of defense counsel, an Article 39(a) session was held, where the following transpired:

DC: Your Honor, as an officer of the court and on [sic] the interest of justice, I request that Captain [B] be removed off this case at this point. I don't know how many times he has to be warned. He knows the rules, we've heard him say it in this courtroom that the Government always follows the rules at earlier 39(a) sessions. I have worked very hard, even with my witnesses to make sure that objectionable testimony doesn't come out; you even saw me do it with Mrs. [H] where I cut her off. And I

think justice calls for Captain [B]'s removal from the case at this point, Your Honor.

TC: Your Honor, I think Captain [M]'s trying to channel your anger and take advantage of the situation here and have you focus it at me. And I think that—I think that – – – –

MJ: You are the problem.

TC: As you see it, sir; I do not see it that way, sir.

MJ: Do you think that it's admissible under any conceivable theory to allow this witness to testify that Mrs. [C] and or [K] were reporting that the accused and his family were making threats?

TC: Certainly not Mrs. [C], no, sir.

MJ: Or [K], for making threats.

TC: I think—I think the statements [K] made to her physician in the course of treatment are admissible and they are relevant, sir.

MJ: Have you read – – – –

TC: And screaming at me is not going to change my opinion on that, sir.

MJ: Take a hike, Captain [B], leave. And when Dr. Speyer is done, you can come back in.

TC: Yes, sir.

After a short recess, the military judge was asked to reconsider his decision to remove trial counsel from questioning this witness. Defense counsel maintained his position that Captain B should be "permanently" removed, even stating that he was "not convinced" Captain B's actions were unintentional. Ultimately, the military judge did modify his decision, permitting Captain B to remain in the courtroom, but directing that the assistant trial counsel complete the examination of Dr. Speyer. Her testimony was completed with only two additional problems: (1) an objection to Dr. Speyer's referring to K as "a victim of abuse," which again caused the judge to caution Dr. Speyer about labeling K as a victim; and (2) the military judge *sua sponte* cutting off a question on redirect which sought to elicit information from Dr. Speyer beyond the diagnosis of trauma.

* See Manual, *supra* at A21–61.

*Mistrial*

Although the military judge made strong reference to the potential for a mistrial after findings and before sentencing, defense counsel did not request a mistrial at any point in the proceedings. This fact was not lost on the military judge:

MJ: Okay. Captain [M], you don't have to sign up for this if you don't want to, but I was surprised that you did not request a mistrial when we got into it with Dr. Speyer and whatnot. Do you have any—would you like to state anything for the record why you did or did not—why you did not move for a mistrial?

DC: Yes, Your Honor. The requested relief at the time we felt was appropriate. It was also a tactical decision on my part considering the way the trial was proceeding. I did consult with my client. At that time we decided that our case was progressing well, that we did not want to risk a second trial. My client and I agreed that it was wrong and not desirable for him to have to undergo a whole new trial. And it was a joint decision made between myself and [appellant].

## DISCUSSION

 Declaration of a mistrial and prosecutorial misconduct must be viewed through the prism formed by the Double Jeopardy Clause of the Fifth Amendment; Article 44(a), UCMJ, 10 USC § 844(a); and RCM 915, Manual for Courts–Martial, United States (1998 edition).

The Constitution, the Code, and the Manual protect the accused against improper retrials. The Double Jeopardy Clause provides: "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb . . . ." Article 44(a) provides that "[n]o person may, without his consent, be tried a second time for the same offense."

 Relying in part on Supreme Court precedent *—see, e.g., Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982); *Arizona v. Washington,* 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978); *United*

*States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976)—RCM 915(a) sets forth that a mistrial may be declared in the discretion of the military judge "when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings." Declaration of a mistrial is, however, "a drastic remedy" which should be used only when necessary "to prevent a miscarriage of justice." *United States v. Garces,* 32 MJ 345, 349 (CMA 1991). A military judge's determination on a request for mistrial, or on his own *sua sponte* consideration of a mistrial, will not be reversed "absent clear evidence of abuse of discretion." *United States v. Rushatz,* 31 MJ 450, 456 (CMA 1990); *United States v. Jeanbaptiste,* 5 MJ 374, 376 (CMA 1978).

 The Double Jeopardy Clause and the Code are designed to protect the accused against repeated attempts to try an individual for the same offense, including subjecting the accused to the embarrassment, expense, and ordeal of a second trial. With this in mind, the judge should examine numerous factors in deciding whether to grant a mistrial, including the timing of the incident leading to the question of mistrial, the identity of the factfinder, the reasons for a mistrial, and potential alternative remedies; but, most importantly, the desires of and the impact on the defendant. *United States v. Donley,* 33 MJ 44, 47 (CMA 1991). The defendant "retain[s] primary control over the course to be followed in the event of" trial errors. *Dinitz,* 424 U.S. at 609, 96 S.Ct. 1075.

This is not an instance where the defense alleges a "Hobson's choice" between retrial and unfairness at the first trial because of intentional or egregious misconduct by the prosecutor. *See id.* at 609, 96 S.Ct. 1075. The military judge demonstrated his keen sensitivity to improper credibility testimony. He repeatedly warned counsel and received assurances that counsel was aware of the limitations. Yet, in at least four instances trial counsel ventured into the area of improper credibility evidence.

Obviously, trial counsel gave the military judge pause to consider the option of a mistrial despite the absence of a request from the defense: "[Y]ou're so damn close to a mistrial, that you're about to try [this case] all over again if you want to." Under these circumstances, the military judge ultimately determined that he could rely upon the various cautionary or limiting instructions he gave the members during trial, and his closing instructions which once again emphasized that credibility was the determination of the members.

The frequency of the warnings should have caused the Government to be vigilant with each and every witness. Yet evidence of that vigilance is lacking. The frequency of the incursions into improper areas is somewhat remarkable under these circumstances. Fortunately, the military judge was vigilant. Proper limiting instructions, along with the presumption that the members followed those instructions, eliminated the risk of harm from this improper credibility evidence. *United States v. Skerrett,* 40 MJ 331, 333–34 (CMA 1994).

Similarly, the military judge corrected the error from the improper evidence of threats. The evidence was never admitted or considered as proper "other acts" evidence. *See* Mil.R.Evid. 404(b), Manual, *supra.* The military judge told the members to disregard the comment about threats as hearsay, and he explained that hearsay denied the appellant an opportunity to confront the allegations of threat. It is presumed that the members followed this instruction. We conclude that there is no prejudicial error in the manner in which the military judge dealt with the evidence of alleged threats made by appellant.

This is not a case where the errors went unnoticed or uncorrected at the time they occurred. The military judge maintained control over the entire proceedings, and thereby caught and took corrective action when inadmissible credibility and uncharged misconduct evidence was improperly broached by trial counsel.

Thus, we hold that the judge did not abuse his discretion by not *sua sponte* declaring a mistrial. We further hold that the corrective action taken by the military judge assured

appellant a fair trial, especially in light of appellant's expressed desires.

The decision of the United States Army Court of Criminal Appeals is affirmed.