# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40290 (f rev)**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Keen A. FERNANDEZ**
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

*Upon Further Review*

Decided 9 January 2024

————————————

*Military Judge*: Elijah F. Brown.

*Sentence*: Sentence adjudged 28 January 2022 by GCM convened at Hurlburt Field, Florida. Sentence entered by military judge on 16 March 2022: Bad-conduct discharge, confinement for 6 months, forfeiture of all pay and allowances, reduction to E-1, and a reprimand.

*For Appellant*: Major Spencer R. Nelson, USAF.

*For Appellee*: Lieutenant Colonel Thomas J. Alford, USAF; Major Morgan R. Christie, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, CADOTTE, and MASON, *Appellate Military Judges*.

Chief Judge JOHNSON delivered the opinion of the court, in which Senior Judge CADOTTE and Judge MASON joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

JOHNSON, Chief Judge:

A general court-martial composed of a military judge alone found Appellant guilty, contrary to his pleas, of one specification of wrongfully distributing child pornography in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934.[1] The military judge sentenced Appellant to a bad-conduct discharge, confinement for six months, total forfeiture of pay and allowances, reduction to the grade of E-1, and a reprimand. The convening authority did not modify the sentence and he provided the adjudged reprimand.

After Appellant's record of trial was docketed with this court, the court discovered a disc constituting one of the prosecution exhibits was cracked and inoperable. Accordingly, this court returned the record of trial to the Chief Trial Judge, Air Force Trial Judiciary, for correction of the record. *United States v. Fernandez*, No. ACM 40290, 2022 CCA LEXIS 668, at *1–2 (A.F. Ct. Crim. App. 17 Nov. 2022) (order).

After correction and re-docketing, Appellant raised eight issues which we have reordered and rephrased in part: (1) whether the military judge erred by denying Appellant's motion for a mistrial; (2) whether the military judge should have recused himself; (3) whether the military judge erroneously admitted testimonial statements in violation of the Confrontation Clause of the Sixth Amendment;[2] (4) whether the 18 U.S.C. § 922 firearm prohibition reflected on the Statement of Trial Results is unconstitutional, and whether this court can review that question; (5) whether there was a presumptively unreasonable post-trial delay under *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006), where a defective exhibit caused this court to remand and re-docket the record of trial; (6) whether the military judge erred in denying Appellant's motion to require a unanimous verdict; (7) whether Appellant is entitled to relief because Air Force Office of Special Investigation (OSI) agents asked for his phone passcode after he invoked his right to remain silent; and (8) whether the Government was allowed to prefer a new charge and specification against Appellant after a preliminary hearing officer determined probable cause was lacking for the original charge and specifications, which the convening authority dismissed.[3] We have carefully considered issues (6), (7), and (8), and find they do not require discussion or relief. *See United States v. Matias*, 25 M.J. 356,

---

[1] All references to the UCMJ, the Rules for Courts-Martial (R.C.M.), and the Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] U.S. CONST. amend. VI.

[3] Appellant personally raises issues (7) and (8) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

361 (C.M.A. 1987). As to the remaining issues, as described below we find no error that materially prejudiced Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

Appellant was born in the Philippines and moved to the United States when he was 13 years old. He joined the Air Force in January 2019, and his first permanent duty station was Cannon Air Force Base (AFB), New Mexico. On 11 December 2019, Appellant sent two videos via Facebook Messenger to an individual in the Philippines. Each video depicted an unidentified female apparently under the age of 18 years engaged in sexually explicit conduct. As a result, Facebook sent a report to the National Center for Missing and Exploited Children (NCMEC), which in turn sent its own report to the New Mexico Attorney General's Internet Crimes Against Children (ICAC) unit. Both reports identified Appellant as the sender of the videos and were accompanied by copies of the videos. An analyst in the ICAC unit reviewed one of the videos and confirmed it depicted apparent sexually explicit conduct involving a child. Information in the NCMEC report indicated Appellant was an Air Force member stationed at Cannon AFB; accordingly, the analyst referred the case to the OSI.

During their investigation, OSI agents obtained directly from Facebook evidence of Appellant's activity on Facebook Messenger, including copies of the same two videos Facebook originally reported to NCMEC as well as records of messages indicating Appellant distributed the two videos to another user. Appellant's messages discussed the contents of the videos with the other user. Among other comments, Appellant asked "isn't it weird" that Appellant "like[d] those videos :).")[4]

## II. DISCUSSION

### A. Motion for Mistrial

#### 1. Additional Background

During the Government's case in chief, trial counsel called a pediatrician, Dr. KG, to testify about the physical characteristics and likely age of the females depicted in the two videos Appellant distributed. During the direct examination, trial counsel played the two videos so that the military judge, witness, counsel, and court reporter could view them, but the spectators in the

---

[4] These messages originally were written in Cebuano and later translated into English.

courtroom could not. During cross-examination, the court reporter, Ms. N, abruptly withdrew from the courtroom. The military judge called a recess.

When proceedings resumed one hour and 21 minutes later, trial counsel announced that a replacement court reporter had been detailed.[5] The military judge described three conferences he held with counsel during the recess in accordance with Rule for Courts-Martial (R.C.M.) 802, which related to communications during the recess between Ms. N and the military judge, and between the military judge and counsel. The military judge allowed trial defense counsel to voir dire him. During the questioning, the military judge explained in more detail his observations and understanding of what had occurred with respect to Ms. N:

> The first time I noticed something was amiss was during the [D]efense's cross-examination when suddenly [Ms. N] scooted her chair back, moved her hand up to her mouth and said, "I'm sorry, I can't," and at that point she stepped down from the court reporter box and then went into the judge's chambers. So what I -- I put the court into recess, and my immediate concern was what was happening with Ms. [N] and whether she was having some kind of medical issue, medical emergency. Because she had motioned with her hand to her mouth it looked like she was feeling nauseous, as opposed to suffering from something like chest pains or something that might be indicative of some sort of cardiovascular issue. And so, if I remember correctly, once the court was in recess I walked into my judge's chambers -- into the judge's chambers. At that point Ms. [N] was not there in the chambers and I thought she must be somewhere else in the building, maybe in a restroom. But when I came back out to the bench to retrieve my laptop and some books and the witness, Dr. [KG], was still on the stand, he offered what I understood as some sort of assistance in case there was some sort of medical issues, and because, I understand he is a pediatrician, I understood that as an offer of some sort of medical assistance, should that be necessary. And I responded to Dr. [KG] as saying, "I think it's nausea," or something to do with nausea based on her motioning with her hand to her mouth. And so at that point I wasn't sure why she was experiencing a feeling of nausea. . . . I

---

[5] This replacement court reporter had served as court reporter for the arraignment and motions hearing held three months earlier. On both occasions, he participated in the proceedings via video-teleconference with the assistance of a paralegal present in the courtroom.

thought, perhaps, maybe that is something that would happen here, she was ill, that the main question is[:] what impact would that have on these proceedings and whether we can continue or whether there would be a delay. When I returned -- I think at that point actually I said, "Counsel, could we have an [R.C.M.] 802 [conference]?" I don't remember if the counsel initiated that or if I said, "Counsel, let's have an 802," and we began to approach the judge's chamber. When I walked into the judge's chamber I saw that Ms. [N] was exiting the adjacent bathroom that's in the judge's chamber, and seemed to be apologizing. And so I thought, since I didn't know what her condition was, rather than have all of the parties crowd into the room I thought I would ask her what was happening, what was going on. And so I think I told the counsel to stand by. At that point I spoke with Ms. [N], and she was repeatedly apologizing, saying, "I'm sorry, I'm sorry. It's just that the evidence that I saw had an unexpected impact on me. I just felt ill." I asked her if she had -- at some point I asked her, "Well, how long have you been a court reporter? Are you -- do you think you can continue, you know, serving as a court reporter in this case if you take some time? Maybe take a walk, get some fresh air," and she indicated that she believed that she could if she had a break. And so that led me to believe that this was not a medical situation at all, it was her emotional reaction that she experienced to the evidence. At that point I asked counsel to come back into the [R.C.M.] 802 [conference] and I explained what had just transpired.

As stated above, Ms. N did not return to the court-martial, and she was replaced as the court reporter. In response to additional questioning by trial defense counsel, the military judge asserted he had "zero concerns about any impact on [his] ability to impartially assess the evidence." The military judge expressed surprise at Ms. N's reaction, given her long experience as a court reporter and that "the subject that's been charged in this case is commonly charged in Air Force courts-martial." The military judge stated he did not view Ms. N's reaction as "reflecting anything about the evidence itself," that it impacted him "not at all," and that it did not "change [his] analysis of the evidence whatsoever." In response to questioning by trial counsel, the military judge agreed that in judge-alone trials military judges are commonly called upon to determine whether evidence is admissible, and to not consider inadmissible evidence when determining guilt or innocence.

Trial defense counsel then called Chief Master Sergeant (CMSgt) RS, who was present in the courtroom observing the trial when Ms. N abruptly exited. CMSgt RS testified regarding his observations:

> When the video first started showing I noticed the court reporter started to watch the video. A few seconds later she started looking away toward her left and to her right, and then moments later she started covering her face with a white paper, I think it's an 8 x 11 white paper. And then suddenly she stood up and reached out to the judge and walked out.

CMSgt RS testified that "[a]s a spectator in the back," he felt "like [Ms. N] saw something disgusting, and it might influence the decision of the case." However, he further testified that he "trust[ed] the judge" was "going to make the right decision for the case," and agreed that he had "confidence" in "this specific judge."

The military judge then heard argument from counsel on an oral defense motion for a mistrial. Trial defense counsel argued such a mistrial was warranted due to the court reporter's reaction to the evidence, "her unique position . . . [,] how the public viewed her, and [ ] her interactions with" the military judge, because "the perception of fairness has been impeded." In response, trial counsel cited case law to the effect that a mistrial is a "drastic remedy" to be granted "only as a last resort to protect and guarantee a fair trial," and emphasized that military judges are expected to evaluate admissible evidence without considering irrelevant matters.

After a recess, the military judge issued an oral ruling denying the Defense's motion for a mistrial. After stating his findings of fact—which were consistent with his voir dire and the testimony of CMSgt RS—and reciting the applicable law, the military judge explained:

> I find that Ms. [N]'s displaying a visible reaction to evidence offered by the [G]overnment, her abruptly leaving the courtroom during the [D]efense's cross-examination, and the military judge having a conversation with her following her departure, does not cast substantial doubt upon the fairness of the proceedings, such that declaring a mistrial is manifestly necessary in the interests of justice. In reaching this finding I considered the forum of the court, which is military judge alone. Ms. [N]'s behavior had and will have no bearing whatsoever on the court's evaluation on the evidence in this case. Additionally, the court has no concerns at all about its ability to disregard entirely what transpired with the court reporter. Since it is a judge[-]alone case I am confident I can and will disregard her behavior entirely.

The trial then resumed with the continued cross-examination of Dr. KG.

**2. Law**

"A military judge has discretion to 'declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings.'" *United States v. Coleman*, 72 M.J. 184, 186 (C.A.A.F. 2013) (quoting R.C.M. 915(a)). Mistrial is "'a drastic remedy' which should be used only when necessary 'to prevent a miscarriage of justice.'" *United States v. Harris*, 51 M.J. 191, 196 (C.A.A.F. 1999) (quoting *United States v. Garces*, 32 M.J. 345, 349 (C.M.A. 1991)). "A military judge has a superior vantage point over appellate courts in making this determination and thus gets 'considerable latitude in determining when to grant a mistrial.' We will not reverse a military judge's determination unless there is 'clear evidence of abuse of discretion.'" *United States v. Flores*, 80 M.J. 501, 507 (C.A.A.F. 2020) (quoting *United States v. Diaz*, 59 M.J. 79, 90 (C.A.A.F. 2003)).

> A military judge abuses his or her discretion when: (1) the military judge predicates a ruling on findings of fact that are not supported by the evidence of record; (2) the military judge uses incorrect legal principles; (3) the military judge applies correct legal principles to the facts in a way that is clearly unreasonable; or (4) the military judge fails to consider important facts.

*United States v. Rudometkin*, 82 M.J. 396, 401 (C.A.A.F. 2022) (citations omitted).

A military judge is "presumed to know the law and to follow it absent clear evidence to the contrary." *United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007) (citation omitted).

**3. Analysis**

On appeal, Appellant asserts the military judge abused his discretion in three ways when he denied the motion for a mistrial. First, Appellant contends the military judge failed to "fully consider" that "he made himself a witness in this case." Second, Appellant argues the military judge "failed to analyze whether he should have recused himself because he made himself a witness." Third, Appellant claims the military judge unreasonably applied the applicable law to the facts because the military judge "did not explain *why* no 'substantial doubt' would be cast upon the fairness of the proceedings even though [Appellant] had chosen a [m]ilitary [j]udge[-]alone forum." We address each point in turn.

We disagree with the premise of Appellant's first point, that the military judge became a witness. Appellant is correct that Mil. R. Evid. 605(a) prohibits the presiding military judge from "testify[ing] as a witness at any proceeding of that court-martial." However, a military judge does not become a testifying

witness, and therefore disqualified, merely by answering voir dire questions posed by counsel. *See, e.g.*, R.C.M. 902(d)(2) ("Each party shall be permitted to question the military judge and to present evidence regarding a possible ground for disqualification before the military judge decides the matter."); *United States v. King*, No. ACM 39583, 2021 CCA LEXIS 415, at *30, 35 (A.F. Ct. Crim. App. 16 Aug. 2021) (unpub. op.) (noting the military judge "permitted the [d]efense an extensive opportunity to voir dire him" and did not abuse his discretion by declining to recuse himself), *aff'd on other grounds*, 83 M.J. 115 (C.A.A.F. 2023). Moreover, military judges are charged with "exercis[ing] reasonable control over the proceedings." R.C.M. 801(a)(3). In this case, those proceedings were brought to an unexpected halt when the court reporter abruptly left the courtroom. We find nothing untoward in the military judge calling a recess and briefly investigating the cause of the disruption and the court reporter's status—particularly where the military judge kept the parties informed through multiple R.C.M. 802 conferences and the opportunity to voir dire him. Ms. N herself was not a witness in the case, and the military judge did not discuss evidentiary matters with her beyond a very brief reference to what they had both already observed during the court-martial. In short, the military judge did not depart from his role as the presiding judge, and he had not become a "witness" that such a status should have factored into his analysis of the motion for a mistrial.

As to Appellant's second point, because the military judge had not become a "witness," he had no cause to recuse himself on that basis, nor to factor such a recusal into his mistrial analysis. Whether the military judge erred in failing to recuse himself *sua sponte* is a distinct assignment of error we analyze below.

Appellant's third point—that the military judge failed to adequately explain his reasoning—is also unpersuasive. A "mistrial is an unusual and disfavored remedy" to "be applied only as a last resort," *Diaz*, 59 M.J. at 90 (citation omitted), and the military judge's determination that it was unnecessary is entitled to considerable deference. In this case, the military judge made findings of fact supported by the record, recited the applicable standards, and explained why Ms. N's reaction would have no improper influence on the court and why observers could be confident in the integrity of the proceedings. Absent evidence to the contrary, military judges are presumed to disregard inadmissible and irrelevant matters during their deliberations. Nothing in the record before us undermines the presumption the military judge could disregard Ms. N's reaction when deciding the merits of the case, or otherwise indicates the military judge abused his discretion when he denied the mistrial motion.

**B. Military Judge Disqualification**

### 1. Additional Background

The relevant additional background is the same as that for the military judge's denial of the motion for a mistrial, Section II.A.1, *supra*.

### 2. Law

We review a military judge's decision whether to recuse himself for an abuse of discretion. *United States v. Sullivan*, 74 M.J. 448, 454 (C.A.A.F. 2015) (citations omitted). However, "[w]hen an appellant . . . does not raise the issue of disqualification until appeal, we examine the claim under the plain error standard of review." *United States v. Martinez*, 70 M.J. 154, 157 (C.A.A.F. 2011) (citing *United States v. Jones*, 55 M.J. 317, 320 (C.A.A.F. 2001)). An appellant is entitled to relief for plain error "where (1) there was error, (2) the error was plain and obvious, and (3) the error materially prejudiced a substantial right of the accused." *United States v. Jones*, 78 M.J. 37, 44 (C.A.A.F. 2018) (citation omitted).

"An accused has a constitutional right to an impartial judge." *United States v. Wright*, 52 M.J. 136, 140 (C.A.A.F. 1999) (citations omitted). Rule for Courts-Martial 902(a) requires disqualification "in any proceeding in which th[e] military judge's impartiality might reasonably be questioned." Disqualification pursuant to R.C.M. 902(a) is determined by applying an objective standard of "whether a reasonable person knowing all the circumstances would conclude that the military judge's impartiality might reasonably be questioned." *Sullivan*, 74 M.J. at 453 (citing *United States v. Hasan*, 71 M.J. 416, 418 (C.A.A.F. 2012)). In addition, R.C.M. 902(b)(3) provides a military judge shall disqualify himself where he "has been or will be a witness in the same case." *See also* R.C.M. 902(b)(5)(C) (disqualifying a military judge who "[i]s to the military judge's knowledge likely to be a material witness in the proceeding").

"There is a strong presumption that a judge is impartial, and a party seeking to demonstrate bias must overcome a high hurdle . . . ." *United States v. Quintanilla*, 56 M.J. 37, 44 (C.A.A.F. 2001) (citation omitted). "Although a military judge is to 'broadly construe' the grounds for challenge, he should not leave the case 'unnecessarily.'" *Sullivan*, 74 M.J. at 454 (quoting R.C.M. 902(d)(1), Discussion).

### 3. Analysis

Appellant contends the military judge's interactions with the court reporter, Ms. N, after she withdrew from the courtroom, and his subsequent voir dire by counsel, made him a witness in the case and therefore disqualified him under R.C.M. 902(b)(3). Because Appellant makes this argument for the first

time on appeal, we review for plain error. We find the military judge did not plainly or obviously err by failing to recuse himself *sua sponte*.

As noted above in relation to the mistrial motion, the Rules for Courts-Martial indicate a military judge does not become a witness in the case merely because counsel ask him questions through voir dire. Rule for Courts-Martial 902(d)(2) permits parties to question the military judge on an issue of possible disqualification "*before* the military judge decides the matter," which necessarily implies the fact of voir dire does not per se disqualify a military judge. (Emphasis added). Moreover, in this case the nature of the voir dire related to the military judge's role in exercising reasonable control over the court-martial proceedings by briefly investigating the reason for Ms. N's abrupt departure from the courtroom. *See* R.C.M. 801(a)(3). The questioning did not directly relate to the substance of the offenses or factfinding related to presentencing proceedings. Allowing voir dire was an appropriate step to help ensure the parties and public (and appellate courts) were fully informed as to whether there was any cause to declare a mistrial or for the military judge to recuse himself. For the reasons explained *supra* in relation to issue (1), we found the military judge did not abuse his discretion by denying the mistrial motion; we are also satisfied the military judge did not plainly err by failing to recuse himself *sua sponte* on the grounds that he had become a "witness" in the case or that his impartiality might reasonably be questioned.

## C. Confrontation Clause

### 1. Additional Background

The Government's first witness for findings was Ms. HR, a criminal analyst who worked for the New Mexico Attorney General's ICAC unit. Ms. HR explained her role was to receive "CyberTips" from NCMEC reporting possible child exploitation. Ms. HR testified she received such a report from NCMEC regarding Appellant. Trial counsel then presented Ms. HR with Prosecution Exhibit 4 (PE 4), which Ms. HR agreed was "a fair and accurate representation of the [document] portion of the CyberTip."

Trial counsel then offered PE 4 into evidence. The military judge asked trial defense counsel whether there was any objection. The record reflects the following subsequent exchange:

> [Trial Defense Counsel]: I didn't actually see the document from the copy that we have.
>
> [Military Judge]: Trial Counsel, could you please show a copy to defense counsel?
>
> [Trial counsel and [trial] defense counsel conferred.]
>
> [No objection from [D]efense.]

(Third and fifth alteration in original). The military judge then admitted PE 4 while "not[ing] for the record that there appear[ed] to be a number of redactions in the document."

Trial counsel then had Ms. HR review and comment on various portions of PE 4. The exhibit consisted of 12 pages divided into four sections. Unredacted portions of "Section A: Reported Information" contained information provided by the "Electronic Service Provider" (Facebook) which reported the suspected child pornography to NCMEC. This section contained significant details about the "Suspect" (Appellant), including *inter alia* his name, phone number, date of birth, email addresses, Facebook profile, and estimated location at the time of the reported incident, as well as the name and certain personal information of the "recipient of the reported content." Section A further indicated Facebook had uploaded three files to NCMEC associated with the reported incident, including two video files of "child exploitation imagery," one of which Facebook personnel had viewed. "Section B: Automated Information Added by NCMEC Systems," is largely redacted, but a subsection labeled "Geo-Lookup (Suspect)" identified three geographic areas—one in the Philippines and two in New Mexico—as well as Internet Protocol (IP) addresses and Internet Service Providers (ISPs) associated with the incident. "Section C: Additional Information Provided by NCMEC" was also largely redacted, but provided the date NCMEC processed the report, categorized the report as "Apparent Child Pornography (Unconfirmed)," indicated NCMEC did not review the uploaded files, and stated NCMEC had reported the matter to law enforcement. Finally, "Section D: Law Enforcement Contact Information" provided contact information for the New Mexico Attorney General's office.

Trial counsel then presented Ms. HR with Prosecution Exhibit 5 (PE 5), a disc containing an electronic version of the NCMEC report and the three files Facebook had uploaded with the report. After Ms. HR identified these as the files she received from NCMEC, trial counsel offered PE 5 into evidence. Trial defense counsel objected to admission of one of the video files on lack of authentication grounds. After hearing argument from counsel, the military judge overruled the objection. The two video files contained in PE 5 appear to depict actual minors engaged in sexually explicit conduct.

Ms. HR further testified that after she received the NCMEC report, she viewed one of the videos which depicted "a pubescent male engaged in sexual acts with a prepubescent female" who appeared to be under the age of 18 years. Ms. HR determined from Appellant's Facebook profile that Appellant was an Airman stationed at Cannon AFB. Therefore, she referred the case to the OSI.

Subsequent prosecution findings witnesses included, *inter alia*, the case agents for the OSI's investigation of Appellant. The agents described investigative steps the OSI took after Ms. HR referred the case to the Air Force. As a

result of these steps, the OSI obtained evidence regarding Appellant directly from Facebook. This evidence included copies of the same two videos of apparent child pornography that had been uploaded with the NCMEC report and admitted as PE 5, as well as records of Facebook Messenger exchanges involving Appellant indicating he distributed the same two videos to a recipient in the Philippines. The Government introduced these videos and messages at trial as additional prosecution exhibits.

**2. Law**

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. "Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 59 (2004) (footnote omitted).

"[A] statement is testimonial if 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *United States v. Sweeney*, 70 M.J. 296, 301 (C.A.A.F. 2011) (quoting *United States v. Blazier*, 68 M.J. 439, 442 (C.A.A.F. 2010)). "[M]achine-generated data and printouts are not statements and thus not hearsay -- machines are not declarants -- and such data is therefore not 'testimonial.'" *United States v. Blazier*, 69 M.J. 218, 224 (C.A.A.F. 2010) (footnote and citations omitted). Chain of custody documents may also be non-testimonial. *United States v. Tearman*, 72 M.J. 54, 59 (C.A.A.F. 2013).

Whether a statement is testimonial for purposes of the Sixth Amendment is a question of law we review de novo. *United States v. Baas*, 80 M.J. 114, 120 (C.A.A.F. 2020) (citation omitted). However, when an appellant did not object to the admission of evidence at trial, we must determine whether the appellant forfeited or waived the objection. *United States v. Bench*, 82 M.J. 388, 392 (C.A.A.F. 2022) (citation omitted), *cert. denied*, 143 S. Ct. 580 (2023). "[F]orfeiture is the failure to make the timely assertion of a right." *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). Waiver occurs when an accused intentionally relinquishes or abandons a known right, but it may also occur by operation of law. *Bench*, 82 M.J. at 392 (citation omitted). However, appellate courts apply a presumption against finding waiver of constitutional rights. *Id.* (citation omitted).

We review forfeited issues for plain error. *Jones*, 78 M.J. at 44 (citation omitted). "When a constitutional issue is reviewed for plain error, the prejudice analysis considers whether the error was harmless beyond a reasonable doubt." *Id.* (citation omitted).

**3. Analysis**

Appellant contends the military judge plainly erred by admitting PE 4 and the "accompanying images" in PE 5 because PE 4 contained testimonial statements in violation of the Confrontation Clause under *Crawford*. Appellant therefore asks us to set aside the findings of guilty and the sentence. In response, the Government contends: (1) Appellant waived his Confrontation Clause objection; and (2) PE 4 contained only machine-generated data rather than testimonial hearsay.

We do not find waiver. We acknowledge PE 4 appears to have been redacted to remove certain narrative portions, likely in an effort to remove objectionable statements. We further acknowledge the record suggests PE 4 was offered in the redacted form trial defense counsel anticipated. However, the record is not clear that there was an affirmative, intentional relinquishment of Appellant's rights under the Confrontation Clause. It is possible the Defense only considered whether to object on hearsay or other non-constitutional grounds. In light of the presumption against finding waiver of constitutional rights, we are not persuaded the record "*clearly established* that there was an intentional relinquishment of a known right." *Sweeney*, 70 M.J. at 303 (emphasis added) (citation omitted). Accordingly, we find Appellant forfeited the objection and we review for plain error.

The parties disagree as to whether PE 4 contained "testimonial statements" for purposes of Confrontation Clause analysis. However, Appellant is not entitled to relief if we conclude beyond a reasonable doubt the asserted error did not materially prejudice Appellant's substantial rights. In the context of an alleged constitutional error, that standard is met where we find "no reasonable possibility that the error might have contributed to the conviction." *United States v. Tovarchavez*, 78 M.J. 458, 460 (C.A.A.F. 2019) (citation omitted).

Assuming *arguendo* the military judge plainly erred by admitting PE 4, in this case we find no reasonable possibility the asserted error influenced the guilty finding. First, the exclusion of PE 4 would not have been fatal to the admission of the two videos of apparent child pornography in PE 5 the Government admitted through the testimony of Ms. HR. Those videos were not testimonial statements and therefore did not implicate the Confrontation Clause.

More importantly, even if neither PE 4 nor PE 5 had been admitted, the Government introduced equivalent evidence—and more—that the OSI obtained directly from Facebook during its investigation. This included not only the same two videos of apparent child pornography included in PE 5, admitted as additional prosecution exhibits, but also records of Facebook messages demonstrating Appellant intentionally distributed the videos to another individual, and that he had viewed the videos before he sent them. Without PE 4

and PE 5, the strength of the Government's proof that Appellant distributed child pornography in violation of Article 134, UCMJ, would have been essentially unchanged. Moreover, whether Appellant distributed the videos was not a contested issue in this case; instead, the Defense suggested the Government failed to prove the videos depicted actual minors, that Appellant knew the videos depicted actual minors, or that his conduct was service discrediting. Thus, the data in PE 4 associating Appellant with the two videos played a negligible role in overcoming the Defense's chosen strategy.

Because we are satisfied beyond a reasonable doubt the admission of PE 4 and the "accompanying images" in PE 5 did not materially prejudice Appellant's substantial rights, Appellant is not entitled to relief.

## D. Firearm Prohibition

### 1. Additional Background

The Statement of Trial Results (STR) and entry of judgment (EoJ) in the instant case—signed by the military judge in accordance with R.C.M. 1101 and R.C.M. 1111, respectively—have attached indorsements from the convening authority's staff judge advocate which recite, *inter alia*, "[t]he following criminal indexing is required . . . Firearm Prohibition Triggered Under 18 U.S.C. § 922: Yes . . . ." The indorsements do not specify which subsections of 18 U.S.C. § 922 trigger the firearm prohibition in Appellant's case.

### 2. Law

We review questions of jurisdiction de novo. *United States v. Hale*, 78 M.J. 268, 270 (C.A.A.F. 2019) (citing *EV v. United States*, 75 M.J. 331, 333 (C.A.A.F. 2016)). "The burden to establish jurisdiction rests with the party invoking the court's jurisdiction." *United States v. LaBella*, 75 M.J. 52, 53 (C.A.A.F. 2015) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Statutory interpretation is also a question of law this court reviews de novo. *United States v. Buford*, 77 M.J. 562, 564 (A.F. Ct. Crim. App. 2017) (citation omitted). "Proper completion of post-trial processing is [also] a question of law this court reviews de novo." *United States v. Valentin-Andino*, 83 M.J. 537, 541 (A.F. Ct. Crim. App. 2023) (citation omitted).

"The [C]ourts of [C]riminal [A]ppeals [(CCAs)] are courts of limited jurisdiction, defined entirely by statute." *United States v. Arness*, 74 M.J. 441, 442 (C.A.A.F. 2015) (citation omitted). This court's authority to review the results of Appellant's court-martial is governed by Article 66, UCMJ, 10 U.S.C. § 866. Article 66(d), UCMJ, provides that a CCA "may act only with respect to the findings and sentence as entered into the record under [Article 60c, UCMJ, 10 U.S.C. § 860c]." 10 U.S.C. § 866(d).

18 U.S.C. § 922(g) provides, in part:

> It shall be unlawful for any person[ ] who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

In *United States v. Lepore*, this court held it lacked authority under a previous version of Article 66, UCMJ (*Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*)), to direct correction of an 18 U.S.C. § 922(g) firearms prohibition annotated on a court-martial promulgating order. 81 M.J. 759, 763 (A.F. Ct. Crim. App. 2021) (en banc).

### 3. Analysis

Relying on *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), and *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *cert. granted*, 143 S. Ct. 2688 (2023), Appellant contends the Government cannot meet its burden to demonstrate the 18 U.S.C. § 922(g) firearm prohibition recited in the indorsements to the STR and EoJ are "consistent with the nation's historical tradition of firearm regulation" and therefore lawful in accordance with the Second Amendment.[6] Appellant accordingly "requests this [c]ourt find the Government's firearm prohibition is unconstitutional . . . ."[7] However, we find this court lacks statutory authority to decide the question.

This court's opinion in *Lepore* would appear to control resolution of the issue. There we explained that Article 66(c), UCMJ (2016 *MCM*), "specifically limit[ed] our authority such that we 'may only act with respect to the findings and sentence' of a court-martial 'as approved by the convening authority.'" *Lepore*, 81 M.J. at 762 (quoting 10 U.S.C. § 866(c)). We held that because the allegedly erroneous 18 U.S.C. § 922(g) firearm prohibition annotation on the promulgating order in that case was a collateral consequence of the conviction, and "not a finding or part of the sentence, nor [a matter] subject to approval by the convening authority," it was beyond our statutory authority to correct. *Id.* at 763 (citations omitted). As Appellant notes, *Lepore* was decided under a previous version of Article 66(c), UCMJ (2016 *MCM*), and the relevant restrictive language has since moved to Article 66(d), UCMJ—in a slightly modified form accounting for the advent of entry of judgment in accordance with Article 60c, UCMJ. However, the limitation that the CCA "may act only with respect to the

---

[6] U.S. Const. amend. II.

[7] Appellant additionally requests this court "order that the Government correct the [STR] to reflect which subsection of [18 U.S.C.] § 922 it used to prohibit his firearm possession."

findings and sentence" is unchanged. 10 U.S.C. § 866(d). The firearms prohibition remains a collateral consequence of the conviction, rather than an element of the findings or sentence, and is therefore beyond our authority to review.

Appellant contends the unpublished decision of the United States Court of Appeals for the Armed Forces (CAAF) in *United States v. Lemire*, 82 M.J. 263 (C.A.A.F. 2022) (mem.), contravenes *Lepore*, which Appellant urges us to overrule. The text of the CAAF's decision in *Lemire* reads, in its entirety: "On consideration of [the a]ppellant's petition for grant of review of the decision of the United States Army Court of Criminal Appeals [ACCA], it is ordered that said petition is granted, and the decision of the [ACCA] is affirmed." *Id.* Appellant focuses on the single footnote, which reads: "It is directed that the promulgating order be corrected to delete the requirement that [the a]ppellant register as a sex offender." *Id.* at 263 n*. Appellant argues that *Lemire* demonstrates: (1) the CAAF has the power to order corrections to administrative errors in promulgating orders; (2) the CAAF "believes that [CCAs] have the power to address collateral consequences under Article 66[, UCMJ,] since it 'directed' the [ACCA] to fix—or have fixed—the erroneous requirement that Sergeant Lemire register as a sex offender;" and (3) CCAs also must have the power to address constitutional errors in promulgating orders even if they relate to collateral consequences of the conviction.

We are not persuaded. Even if we accept that the sex offender registration requirement referred to in *Lemire* is analogous to the firearms prohibition in Appellant's case,[8] we do not find that decision vitiates this court's published opinion in *Lepore*.

First, the circumstances and reasoning behind the CAAF's direction to correct the promulgating order are opaque. Neither the CAAF's unpublished summary disposition nor the ACCA's summary per curiam opinion provide information about the circumstances of the case. *See Lemire*, 82 M.J. at 263; *United States v. Lemire*, No. ARMY 20190129, 2021 CCA LEXIS 461 (A. Ct. Crim. App. 13 Sep. 2021) (per curiam) (unpub. op.), *aff'd*, 82 M.J. 263 (C.A.A.F. 2022). Accordingly, we cannot discern the rationale behind the CAAF-ordered correction—for example, whether the sex offender registration notation was a clerical error, or whether some deeper legal principles and analysis were involved.

Second, Appellant is incorrect when he asserts the CAAF "directed" the ACCA "to fix—or have fixed" the promulgating order. The CAAF's decision in

---

[8] *Cf. United States v. Miller*, 63 M.J. 452, 457 (C.A.A.F. 2006) (describing sex offender registration as a collateral consequence of conviction "separate and distinct from the court-martial process"). *But cf. United States v. Riley*, 72 M.J. 115, 121 (C.A.A.F. 2013) ("[W]e hold that in the context of a guilty plea inquiry, sex offender registration consequences can no longer be deemed a collateral consequence of the plea.").

*Lemire*, quoted in its entirety above, does not direct the ACCA to do anything. Notably, it affirms the ACCA's decision without remanding the case to ACCA for any purpose. Presumably its direction to correct the promulgating order was directed to "an appropriate convening authority." *See* R.C.M. 1114(b)(2)(B) (2016 *MCM*). Accordingly, *Lemire* does not imply the CAAF believes the CCAs have the authority to address alleged constitutional errors relating to collateral consequences of a court-martial conviction annotated on promulgating orders.

Third, this court's unanimous, en banc, published decision in *Lepore* reflects the consistent recent trend of this court's opinions finding collateral consequences of a court-martial are beyond our statutory authority to review. *See Lepore*, 81 M.J. at 762 (citing cases in which this court found it lacked jurisdiction "where appellants have sought relief for alleged deficiencies unrelated to the legality or appropriateness of the court-martial findings or sentence" (citations omitted)). We do not find any aspect of Appellant's case gives us cause to revisit or overrule the decision in *Lepore*.

Accordingly, we do not address the substance of Appellant's argument that the 18 U.S.C. § 922(g) firearms restriction is unconstitutional in this case.

**E. Post-Trial Delay**

**1. Additional Background**

The military judge sentenced Appellant on 28 January 2022. Appellant's record of trial was initially docketed with this court on 10 June 2022. Appellant subsequently moved for and, over the Government's opposition, was granted three enlargements of time in which to submit his assignments of error, until 7 December 2022.

On 4 November 2022, Appellant moved to examine certain sealed material in the original record of trial. As a result, this court discovered a disc constituting a sealed prosecution exhibit was cracked and inoperable. Accordingly, on 17 November 2022, this court returned the record of trial to the Chief Trial Judge, Air Force Trial Judiciary, for correction. The defective exhibit was replaced via a certificate of correction dated 15 December 2022, and the corrected record was re-docketed with this court on 19 December 2022.

Appellant thereafter requested and received an additional enlargement of time before filing his assignments of error on 3 April 2023. The Government requested and was granted one enlargement of time before filing its answer brief on 2 June 2023. Appellant submitted a reply brief on 8 June 2023.

**2. Law**

"[C]onvicted servicemembers have a due process right to timely review and appeal of courts-martial convictions." *United States v. Moreno*, 63 M.J. 129,

135 (C.A.A.F. 2006) (citations omitted). In *Moreno*, the CAAF established a presumption of facially unreasonable delay "where the action of the convening authority is not taken within 120 days of the completion of trial," "where the record of trial is not docketed by the [CCA] within thirty days of the convening authority's action," or "where appellate review is not completed and a decision is not rendered within eighteen months of docketing the case before the [CCA]." *Id.* at 142. In *United States v. Livak*, 80 M.J. 631 (A.F. Ct. Crim. App. 2020), this court adapted the *Moreno* thresholds for facially unreasonable delay to the new post-trial processing regime that went into effect in 2019. Specifically, *Livak* established an aggregated 150-day standard for facially unreasonable delay from sentencing to docketing with the CCA for cases referred to trial on or after 1 January 2019. *Id.* at 633.

Where there is a facially unreasonable delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citations omitted). The CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) "particularized" anxiety and concern "that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision;" and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. *Id.* at 138–40 (citations omitted). Where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). We review de novo an appellant's entitlement to relief for post-trial delay. *Livak*, 80 M.J. at 633 (citing *Moreno*, 63 M.J. at 135).

### 3. Analysis

#### a. Pre-Docketing Delay

Appellant contends the 325 days which elapsed between his sentencing on 28 January 2022 and the re-docketing of the corrected record of trial on 19 December 2022 amounts to a facially unreasonable delay. Although Appellant's case was originally docketed with this court only 133 days after he was sentenced—within the 150-day standard established by *Livak*—Appellant argues "[t]his [c]ourt should find that the Government fails to meet its *Moreno* and *Livak* deadline if the [record] it submitted for docketing does not comport with statutory and regulatory requirements." Appellant contends that our failure to do so will "incentivize" the Government to, in effect, prioritize speed over accuracy, increasing the likelihood that this court will need to remand the record for correction and ultimately delaying our final decision in the case. Having

asserted a facially unreasonable delay, Appellant does not provide a full analysis of the *Barker* factors or allege any specific prejudice. However, Appellant implies this court should find a due process violation and requests we not approve the adjudged bad-conduct discharge.

We decline to interpret *Moreno* and *Livak* in the manner Appellant suggests. To do so would be contrary to the plain meaning of those opinions. In *Moreno*, the CAAF stated the presumption of unreasonable delay applies "where the record of trial is not docketed" by the CCA within the specified time frame. 63 M.J. at 142. As applied by *Livak*, that timeframe is within 150 days of sentencing. 80 M.J. at 633. In Appellant's case, the record *was* docketed within 150 days, and therefore the per se facially unreasonable sentencing-to-docketing delay does not apply. Appellant does not direct our attention to any ruling by the CAAF or this court holding that a subsequent remand by the CCA to correct one or more errors in the record effectively extends or reopens the period under consideration for facially unreasonable delay until the corrected record is re-docketed, and we are aware of none. *Cf. United States v. Gammage*, No. ACM S32731 (f rev), 2023 CCA LEXIS 528, at *5–6 (A.F. Ct. Crim. App. 15 Dec. 2023) (unpub. op.) (finding original docketing of record with CCA 55 days after sentencing "categorically complied" with 150-day *Livak* standard for facially unreasonable delay despite subsequent remand due to incomplete record of trial).

On the other hand, neither the CAAF nor this court has held that the specific time standards in *Moreno* are the exclusive means by which an appellant may demonstrate a facially unreasonable delay for due process purposes. *See United States v. Greer*, No. ACM 39806 (f rev), 2022 CCA LEXIS 411, at *15 (A.F. Ct. Crim. App. 18 Jul. 2022) (unpub. op.) (citing *United States v. Swanson*, No. ACM. 38827, 2016 CCA LEXIS 648, at *21 (A.F. Ct. Crim. App. 27 Oct. 2016) (unpub. op.)). Put another way, *Moreno* and *Livak* are a shield for an appellant's due process rights, not a sword for the Government to wield against appellants. Accordingly, a facially unreasonable delay could potentially have occurred between Appellant's sentencing on 28 January 2022 and initial docketing on 10 June 2022. However, Appellant has not alleged such a delay, and we discern none from the record. Accordingly, we find no violation of Appellant's due process rights during the period prior to docketing.

Recognizing our authority under Article 66(d), UCMJ, 10 U.S.C. § 866(d), we have also considered whether relief for excessive post-trial delay is appropriate for delay between sentencing and docketing. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude no such relief is warranted.

### b. Appellate Delay

Next we consider whether Appellant is entitled to relief for post-docketing delay—that is, any delay that occurred after initial docketing on 10 June 2022. Over 18 months have elapsed since Appellant's record of trial was originally docketed. Assuming for purposes of our analysis that the November 2022 remand and December 2022 re-docketing of the record did not "reset" the *Moreno* timeline, there is a facially unreasonable delay in the appellate proceedings. Accordingly, we have considered the *Barker* factors to assess whether Appellant suffered a due process violation. However, because Appellant has suffered no cognizable prejudice, we will find a due process violation only if delays were so egregious as to affect the public's perception of the fairness and integrity of the military justice system. *See Toohey*, 63 M.J. at 362.

With respect to the length of the delay, although we assume for purposes of our analysis it is facially unreasonable, we do not find it is egregious or weighs heavily in Appellant's favor. Appellate review has exceeded the *Moreno* standard by less than one month.

We similarly find the reasons for delay are not egregious. We have specifically considered the delays associated with the remand as part of our analysis. In this case, the deficiency in the record was a damaged exhibit rather than a missing one. The Government is required to include functional exhibits in the record, but the fact that the exhibit was present rather than missing entirely made the error less obvious. Moreover, the fact that it was a sealed exhibit meant (a) it was not included in most copies of the record of trial, and (b) a very limited number of people had authority to view or inspect the disc. Furthermore, it is unclear at what point in time the disc was damaged; it is possible the Government had no practical opportunity to inspect the disc after it was damaged. In addition, we note that once the record was remanded to the Chief Trial Judge, it took approximately one month to accomplish the correction and re-docket the record. As for other contributing reasons for delay, we note much of the elapsed time is attributable to the time afforded Appellant to file his assignments of error, augmented by several motions for enlargements of time. Although the five-volume record of trial is not especially voluminous, we do not find the reasons for delay, considered together, to undermine the public's perception of the fairness or integrity of the military justice system.

Appellant has not made a demand for speedy appellate review. Although Appellant's assignment of errors asserted the delay between his sentencing and the post-remand re-docketing was facially unreasonable, complaining about a past delay is distinct from demanding speed at the present time. Accordingly, we find this factor weighs against finding a due process violation.

As stated above, Appellant asserts no qualifying particularized prejudice from the delay, and we perceive none.

For the foregoing reasons, we find the delay is not so egregious as to impugn the fairness or integrity of the military justice system. Accordingly, we find no violation of Appellant's due process rights.

Again mindful of our Article 66, UCMJ, authority to grant relief for appellate delay in the absence of a due process violation, we have considered whether such relief is appropriate and find it is not. *See Tardif*, 57 M.J. at 225; *Gay*, 74 M.J. at 742.

## III. Conclusion

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to Appellant's substantial rights occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court